TEXAS ASSOCIATION OF
BUSINESS, Appellant,

v.

TEXAS AIR CONTROL BOARD and
Texas Water Commission,
Appellees.

No. C–9556.

Supreme Court of Texas.

March 3, 1993.

Rehearing Overruled May 5, 1993.

R. Kinnan Golemon, James W. Checkley, Jr., Albert R. Axe, Jr., Scott R. Kidd and Douglas W. Alexander, Austin, for appellant.

Douglas G. Caroom, Mary E. Kelly, Dan Morales, Nancy N. Lynch, William D. Dugat, III and Amy R. Johnson, Austin, for appellees.

## OPINION

CORNYN, Justice.

The Texas Association of Business (TAB), on behalf of its members, brought this declaratory judgment action seeking a ruling that statutes empowering two state administrative agencies to levy civil penalties for violations of their regulations conflict with the open courts and jury trial provisions of the Texas Constitution. The administrative agencies denied TAB's claims, and along with two Intervenors,[1] filed counterclaims seeking a declaration

---

1. The League of Women Voters and the Lone Star Chapter of the Sierra Club intervened in the suit and were aligned as defendants with the Texas Air Control Board and the Texas Water Commission. Justice Doggett contends that the standing of the Intervenors should be addressed along with TAB's. We disagree. Standing concerns a party's faculty to invoke the court's subject matter jurisdiction. Once it has been invoked by a plaintiff, a court's subject matter jurisdiction is not affected by the status of defendants or intervenors aligned in interest with defendants.

**442**

that the same statutes and regulations comport with those constitutional provisions.

Following a bench trial, the trial court denied the relief sought by TAB, and as requested by the State and Intervenors, declared that section 4.041 of the Texas Clean Air Act, sections 26.136 and 27.1015 of the Texas Water Code, and section 8b of the Texas Solid Waste Disposal Act, as well as the rules and regulations promulgated under those statutes, are constitutional with regard to the open courts and jury trial provisions. We affirm the trial court's judgment as it relates to TAB's jury trial challenge and reverse its judgment as to TAB's open courts challenge.

An overview of the regulatory scheme enacted by the legislature and these agencies is essential to an understanding of this case. In 1967, the Texas Legislature enacted the Clean Air Act of Texas. Clean Air Act of Texas, 60th Leg., R.S., ch. 727, 1967 Tex.Gen.Laws 1941. The Clean Air Act was designed to safeguard the state's air resources without compromising the economic development of the state. *Id.* at § 1. The Act created the Texas Air Control Board and granted it the authority to promulgate regulations to accomplish the Act's goals. *Id.* at § 4(A)(2)(a). In the event the Air Control Board determined that a violation of its regulations had occurred, it was authorized to enforce those regulations in district court. Upon a judicial determination that a violation of the Air Control Board's regulations had occurred, two cumulative remedies were available, injunctive relief to prohibit further violations and assessment of a fine ranging from $50 to $1,000 for each day the violations persisted. *Id.* at § 12(B).

In 1969, the Texas Legislature enacted the Solid Waste Disposal Act. Solid Waste Disposal Act, 61st Leg., R.S., ch. 405, 1969 Tex.Gen.Laws 1320. The express purpose

for this legislation was to protect public health and welfare by regulating the "collection, handling, storage, and disposal of solid waste." *Id.* at § 1. The Texas Water Quality Board was designated the primary agency to effectuate the Disposal Act's purpose. *Id.* at § 4(f). Like the Air Control Board, the Water Quality Board was authorized to enforce its rules and regulations in state district court. The Solid Waste Disposal Act provided the same remedies as the Clean Air Act. *See id.* at § 8(c).

In the last of the relevant statutory enactments, in 1969, the Texas Legislature promulgated a revised version of the Water Quality Act. Water Quality Act—Revision, 61st Leg., R.S., ch. 760, 1969 Tex.Gen.Laws 2229. By that Act, the Water Quality Board was given the power to develop a statewide water quality plan, to perform research and investigations, and to adopt rules and issue orders necessary to effectuate the Act's purposes. *Id.* at § 3.01–3.10. The Water Quality Act provided the same remedies as the Solid Waste Management Act and the Clean Air Act. *See id.* at § 4.02.

Originally, neither the Water Quality Board nor the Air Control Board had the power to levy civil penalties directly in the event it determined that its regulations or orders had been violated. Instead, each board was required first to file suit against the violator in district court. Only the district court had the power to assess civil penalties.

The legislature substantially changed this enforcement scheme in 1985. That year the Air Control Board and the Water Commission (formerly the Water Control Board) were granted the power to assess civil penalties directly of up to $10,000 per day per violation.[2] Both administrative bodies also retained the option to pursue civil penalties in district court. TEX.HEALTH

**2.** Act of June 14, 1985, 69th Leg., R.S., ch. 637, § 33, 1985 Tex.Gen.Laws 2350, 2359 (amending Texas Clean Air Act codified at TEX.REV.CIV.STAT. ANN. art. 4.041 (Vernon 1976), currently codified as amended at TEX.HEALTH & SAFETY CODE § 382.-088; Act of June 15, 1985, 69th Leg., R.S., ch. 795, § 6.001, 1985 Tex.Gen.Laws 2719, 2813

(amending Solid Waste Disposal Act codified at TEX.REV.CIV.STAT.ANN. art. 4477–7 (Vernon 1976), currently codified as amended at TEX.HEALTH & SAFETY CODE § 361.252; Act of June 15, 1985, 69th Leg., R.S., ch. 795, § 5.007, 1985 Tex.Gen. Laws 2719, 2806 (amending TEX.WATER CODE § 26.136).

& SAFETY CODE §§ 361.224, 382.081; TEX.WATER CODE § 26.123. This was the regulatory scheme in effect when the district court rendered judgment in this case.[3]

After the Air Control Board or Water Commission assesses a penalty, the offender must either timely pay the penalty or file suit in district court. However, a supersedeas bond or cash deposit paid into an escrow account, in the full amount of the penalty, is a prerequisite to judicial review. TEX.HEALTH & SAFETY CODE §§ 382.089(a), (b), 361.252(k), (*l*); TEX.WATER CODE § 26.-136(j). A party who fails to make a cash deposit or file a bond forfeits all rights to judicial review. TEX.HEALTH & SAFETY CODE §§ 361.252(m), 382.089(c); TEX.WATER CODE § 26.136(k).

TAB alleges that it is a Texas not-for-profit corporation, that its members do business throughout Texas, and that it is authorized to represent its members on any matter that may have an impact on their businesses.

TAB filed this suit under the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–37.011, alleging that some of its members had been subjected to civil penalties assessed by either the Air Control Board or the Water Commission. TAB further alleged that all of its other members that operate their businesses pursuant to the pertinent provisions of the Texas Clean Air Act, the Texas Water Code, or the Texas Solid Waste Disposal Act or any rules or orders issued pursuant to those provisions were put at "substantial risk (if not certainty)" of being assessed civil penalties by the Air Control Board or the Water Commission. Thus this suit does not challenge specific instances of the Air Control Board's or the Water Commission's exercise, or threatened exercise, of the civil penalty power. Instead, TAB's suit is a facial challenge to the constitutionality of this administrative enforcement scheme under the Texas Constitution.

The Defendants and Intervenors counterclaimed seeking a declaratory judgment that the statutes, rules, and regulations challenged by TAB do not, on their face, conflict with the open courts and jury trial provisions of our constitution. The trial court granted the Defendants' and Intervenors' requested declaratory judgment and denied TAB's request for a declaratory judgment. The court also denied TAB's request for injunctive relief.

TAB appealed directly to this court. *See* TEX.GOV'T CODE § 22.001(c); [4] TEX.R.APP.P. 140. In this court, TAB has limited its challenges to claims of unconstitutional denial of a jury trial and violation of our constitution's open courts provision.

## I. Standing

Before we reach the merits of this case, we first consider the matter of the trial court's jurisdiction, as well as our own; specifically we determine whether TAB has standing to challenge the statutes and regulations in question. Because TAB's standing to bring this action is not readily apparent, and because our jurisdiction as well as that of the trial court depends on this issue, we requested supplemental briefing on standing at the oral argument of this case. In response, the parties insist that any question of standing has been waived in the trial court and cannot be raised by the court for the first time on appeal. We disagree.

■ Subject matter jurisdiction is essential to the authority of a court to decide a case. Standing is implicit in the concept of subject matter jurisdiction. The standing requirement stems from two limitations on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision. Subject matter jurisdic-

---

**3.** Although some amendments have been adopted since, they are not relevant to the issue presented in this case. *See* Diana C. Dutton, *ENVIRONMENTAL*, 45 SW. L.J. 389 (1991) (summarizing statutory developments).

**4.** "An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." TEX.GOV'T CODE § 22.001(c).

tion is never presumed and cannot be waived.[5]

One limit on courts' jurisdiction under both the state and federal constitutions is the separation of powers doctrine. *See* TEX.CONST. art. II, § 1; *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471–74, 102 S.Ct. 752, 757–60, 70 L.Ed.2d 700 (1982); *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975); *see also*, Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 18 SUFFOLK U.L.Rev. 881, 889 n. 69 (1983) (noting that the dicta of *Flast v. Cohen*, 392 U.S. 83, 100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), suggesting that standing is unrelated to the separation of powers doctrine has since been disavowed). Under this doctrine, governmental authority vested in one department of government cannot be exercised by another department unless expressly permitted by the constitution. Thus we have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department.[6] *Firemen's Ins. Co. v. Burch*, 442 S.W.2d 331, 333 (Tex.1969); *Morrow v. Corbin*, 122 Tex. 553, 62 S.W.2d 641, 644 (Tex.1933). Accordingly, we have interpreted the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE §§ 37.001–.011, to be merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions. *Firemen's Ins. Co.*, 442 S.W.2d at 333; *United Serv. Life Ins. Co. v. Delaney*, 396 S.W.2d 855, 863 (Tex.1965); *California Prods., Inc. v. Puretex Lemon Juice, Inc.*, 160 Tex. 586, 334 S.W.2d 780 (1960).

The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties.

*Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945); *Firemen's Ins. Co.*, 442 S.W.2d at 333; *Puretex Lemon Juice, Inc.*, 160 Tex. at 591, 334 S.W.2d at 783. An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Texas courts, like federal courts, have no jurisdiction to render such opinions.

The separation of powers doctrine is not the only constitutional basis for standing. Under federal law, standing is also an aspect of the Article III limitation of the judicial power to "cases" and "controversies." *Sierra Club v. Morton*, 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). To comport with Article III, a federal court may hear a case only when the litigant has been threatened with or has sustained an injury. *Valley Forge Christian College*, 454 U.S. at 471, 102 S.Ct. at 758. Under the Texas Constitution, standing is implicit in the open courts provision, which contemplates access to the courts only for those litigants suffering an injury. Specifically, the open courts provision provides:

> All courts shall be open, and every person for an **injury** done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

TEX. CONST. art. I, § 13 (emphasis added). Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield.

Under federal law, a lack of standing deprives a court of subject matter jurisdiction because standing is an element of such

---

5. Justice Doggett confuses subject matter jurisdiction with personal jurisdiction. Only the latter can be waived when uncontested. *See* TEX. R.CIV.P. 120a.

6. The analysis is the same under the federal constitution. *See e.g. Correspondence of the Justices,* Letter from Chief Justice John Jay and the Associate Justices to President George Washington, August 8, 1793 in Laurence H. Tribe, *American Constitutional Law* 73 n. 3 (2nd ed. 1988).

jurisdiction. *Carr v. Alta Verde Indus.*, 931 F.2d 1055, 1061 (5th Cir.1991); *Simmons v. Interstate Commerce Comm'n*, 900 F.2d 1023, 1026 (7th Cir.1990); *M.A.I.N. v. Commissioner, Maine Dept. of Human Serv.*, 876 F.2d 1051, 1053 (1st Cir.1989); *Haase v. Sessions*, 835 F.2d 902, 908 (D.C.Cir.1987); *Page v. Schweiker*, 786 F.2d 150, 153 (3d Cir.1986); *see also Lujan v. Defenders of Wildlife*, — U.S. —, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Heckler v. Mathews*, 465 U.S. 728, 737, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984); *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211. Other states have followed this analysis in construing their own constitutions.[7] *See e.g., Prudential–Bache Sec., Inc. v. Commissioner of Revenue*, 412 Mass. 243, 588 N.E.2d 639, 642 (1992); *Bennett v. Board of Trustees for Univ. of N. Colorado*, 782 P.2d 1214, 1216 (Colo.App.1989), *cert. denied*, 797 P.2d 748 (Colo.1990); *Pace Constr. Co. v. Missouri Highway and Transp. Comm'n*, 759 S.W.2d 272, 274 (Mo. App.1988); *Terracor v. Utah Bd. of State Lands & Forestry*, 716 P.2d 796, 798–99 (Utah 1986); *State by McClure v. Sports and Health Club, Inc.*, 370 N.W.2d 844, 850 (Minn.1985), *appeal dism'd*, 478 U.S. 1015, 106 S.Ct. 3315, 92 L.Ed.2d 730 (1986); *Smith v. Allstate Ins. Co.*, 483 A.2d 344, 346 (Me.1984); *Ardmare Constr. Co. v. Freedman*, 191 Conn. 497, 467 A.2d 674, 675 n. 4, 676–77 (1983); *Horn v. County of Ventura*, 24 Cal.3d 605, 156 Cal.Rptr. 718, 726, 596 P.2d 1134, 1142 (1979); *Stewart v. Board of County Comm'rs of Big Horn County*, 175 Mont. 197, 573 P.2d 184, 186, 188 (1977); *State ex rel. Albritton v. Moore*, 238 La. 728, 116 So.2d 502, 504 (1959).

■ Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties. *Texas Employment Comm'n v. International Union of Elec., Radio and Mach. Workers, Local Union No. 782*, 163 Tex. 135, 352 S.W.2d 252, 253 (1961); RESTATEMENT (SECOND) OF JUDGMENTS § 11, comment c (1982). This court recently reiterated that axiom in *Gorman v. Life Insurance Co.*, 811 S.W.2d 542, 547 (Tex.), *cert. denied*, — U.S. —, 112 S.Ct. 88, 116 L.Ed.2d 60 (1991). Because we conclude that standing is a component of subject matter jurisdiction, it cannot be waived and may be raised for the first time on appeal.[8]

■ If we were to conclude that standing is unreviewable on appeal at least three undesirable consequences could result. First and foremost, appellate courts would be impotent to prevent lower courts from exceeding their constitutional and statutory limits of authority. Second, appellate courts could not arrest collusive suits. Third, by operation of the doctrines of res judicata and collateral estoppel, judgments rendered in suits addressing only hypothetical injuries could bar relitigation of issues by a litigant who eventually suffers an actual injury. We therefore hold that standing, as a component of subject matter

---

**7.** Of the states listed by Justice Doggett, only Illinois, Iowa, Kentucky, New York, South Dakota, and perhaps Ohio, Pennsylvania and Washington actually treat jurisdictional standing as waivable. *See* 852 S.W.2d at 469. The other state cases cited deal with the waiver of objections to join a real party in interest or to a party's capacity to sue rather than to jurisdictional standing. *See International Depository, Inc. v. State*, 603 A.2d 1119, 1122 (R.I.1992) (addressing real party in interest objection); *Princess Anne Hills Civ. League, Inc. v. Susan Constant Real Estate Trust*, 243 Va. 53, 413 S.E.2d 599, 603 n. 1 (1992) (addressing real party in interest objection); *Sanford v. Jackson Mall Shopping Ctr. Co.*, 516 So.2d 227, 230 (Miss.1987) (addressing real party in interest objection); *Jackson v. Nangle*, 677 P.2d 242, 250 n. 10 (Alaska 1984) (addressing real party in

interest objection); *Poling v. Wisconsin Physicians Serv.*, 120 Wis.2d 603, 357 N.W.2d 293, 297–98 (App.1984) (addressing real party in interest objection); *Torrez v. State Farm Mut. Auto. Ins. Co.*, 130 Ariz. 223, 635 P.2d 511, 513 n. 2 (App.1981) (addressing real party in interest objection); *Brown v. Robinson*, 354 So.2d 272, 273 (Ala.1977); *Cowart v. City of West Palm Beach*, 255 So.2d 673, 675 (Fla.1971) (addressing capacity objection).

**8.** Justice Doggett disagrees that standing is a component of subject matter jurisdiction, yet he declines to explain what role standing plays in our jurisprudence. From his harsh critique of the doctrine, it seems that he not only objects to the conclusion that standing cannot be waived but also to the conclusion that standing is a requirement to initiate a lawsuit.

jurisdiction, cannot be waived in this or any other case and may be raised for the first time on appeal by the parties or by the court.

We are aware that this holding conflicts with *Texas Industrial Traffic League v. Railroad Commission*, 633 S.W.2d 821, 823 (Tex.1982) (per curiam).[9] The analysis that leads us to the conclusion we reach here, however, compels us to overrule *Texas Industrial Traffic League* and disapprove of all cases relying on it to the extent that they conflict with this opinion.[10] Although our concern for the rule of stare decisis makes us hesitant to overrule any case, when constitutional principles are at issue this court as a practical matter is the only government institution with the power and duty to correct such errors. *See Payne v. Tennessee*, —— U.S. ——, ————, 111 S.Ct. 2597, 2609–11, 115 L.Ed.2d 720 (1991) (observing that reexamination of constitutional decisions is appropriate when "correction through legislative action is practically impossible").

Consequently, we proceed to determine here, on our own motion, whether TAB has standing to bring this suit.

■■■ Because standing is a component of subject matter jurisdiction, we consider TAB's standing under the same standard by which we review subject matter jurisdiction generally. That standard requires the pleader to allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Richardson v. First Nat'l Life Ins. Co.*, 419 S.W.2d 836, 839 (Tex.1967). When reviewing a trial court order dismissing a cause for want of jurisdiction, Texas

appellate courts "construe the pleadings in favor of the plaintiff and look to the pleader's intent." *Huston v. Federal Deposit Ins. Corp.*, 663 S.W.2d 126, 129 (Tex. App.—Eastland 1983, writ ref'd n.r.e. 1984); *see also* W. Wendell Hall, *Standards of Appellate Review in Civil Appeals*, 21 St. Mary's L.J. 865, 870 (1990).

■■■ Here, however, we are not reviewing a trial court order of dismissal for want of jurisdiction, we are considering standing for the first time on appeal. A review of only the pleadings to determine subject matter jurisdiction is sufficient in the trial court because a litigant has a right to amend to attempt to cure pleading defects if jurisdictional facts are not alleged. *See* Tex.R.Civ.P. 80. Failing that, the suit is dismissed. When an appellate court questions jurisdiction on appeal for the first time, however, there is no opportunity to cure the defect. Therefore, when a Texas appellate court reviews the standing of a party sua sponte, it must construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing.

■■■ TAB asserts standing on behalf of its members. The general test for standing in Texas requires that there "(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Board of Water Engineers v. City of San Antonio*, 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955). Texas, however, has no particular test for determining the standing of an organization, such as TAB. *See e.g., Touchy v.*

---

**9.** *Texas Industrial Traffic League* relied on two cases to support its holding that standing cannot be raised for the first time on appeal: *Coffee v. William Marsh Rice University*, 403 S.W.2d 340, 341 (Tex.1966), and *Sabine River Authority v. Willis*, 369 S.W.2d 348, 350 (Tex.1963). We need not overrule these two cases, however, because unlike *Texas Industrial Traffic League*, we believe that standing was present in the trial court in these cases. Our concern is with a party's right to initiate a lawsuit and the trial court's corresponding power to hear the case *ab initio*. Standing is determined at the time suit is filed in the trial court, and subsequent events do not deprive the court of subject matter jurisdiction. *Carr*, 931 F.2d at 1061.

**10.** Justice Doggett claims that we overrule three additional decisions of this court. *See Central Educ. Agency v. Burke*, 711 S.W.2d 7 (Tex.1986) (per curiam); *American Gen. Fire & Casualty Co. v. Weinberg*, 639 S.W.2d 688 (Tex.1982); *Cox v. Johnson*, 638 S.W.2d 867 (Tex.1982) (per curiam). We disagree. These cases hold that matters not raised in the trial court are waived. One exception noted by these decisions, however, is a lack of jurisdiction which may be raised by a party, or the court, for the first time on appeal. Justice Doggett does not believe that standing falls within that exception because he contends that standing is not jurisdictional.

*Houston Legal Found.*, 432 S.W.2d 690, 694 (Tex.1968); *Texas Highway Comm'n v. Texas Ass'n of Steel Importers, Inc.*, 372 S.W.2d 525, 530–31 (Tex.1963). While we agree with the statement of the general test for standing set out in *Board of Water Engineers*, we foresee difficulties in relying on it alone to determine the standing of an organization like TAB. For instance, when members of an organization have individual standing, but the organization was not established for the purpose of protecting the particular interest at issue, it is not necessarily in the members' best interest to allow such a disinterested organization to sue on their behalf. Furthermore, an organization should not be allowed to sue on behalf of its members when the claim asserted requires the participation of the members individually rather than as an association, such as when the members seek to recover money damages and the amount of damages varies with each member.

■ The United States Supreme Court has articulated a standard for associational standing that lends itself to our use. We adopt that test today. In *Hunt v. Washington State Apple Advertising Commission*, the Court held that an association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also New York State Club Ass'n v. City of New York*, 487 U.S. 1, 9, 108 S.Ct. 2225, 2231, 101 L.Ed.2d 1 (1988); *International Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986). This standard incorporates the standing analysis we adopted in *Board of Water Engineers*, yet addresses the additional concerns we have noted.

■ We now apply the *Hunt* standard to the case before us. Reviewing the record in its entirety for evidence supporting

subject matter jurisdiction, and resolving any doubt in TAB's favor, we conclude that TAB has standing to pursue the relief it seeks in this case.

The first prong of the *Hunt* test requires that TAB's pleadings and the rest of the record demonstrate that TAB's members have standing to sue in their own behalf. This requirement should not be interpreted to impose unreasonable obstacles to associational representation. In this regard the United States Supreme Court stated that "the purpose of the first part of the *Hunt* test is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *New York State Club Ass'n*, 487 U.S. at 9, 108 S.Ct. at 2232. We are satisfied that TAB has not manufactured this lawsuit. A comparison of the association's membership roster with the list of businesses subjected to state penalties indicates individual TAB members have been assessed administrative penalties pursuant to the challenged enactments. Additionally, TAB has alleged that other of its members remain at substantial risk of penalty. A substantial risk of injury is sufficient under *Hunt*. *See e.g., Pennell v. City of San Jose*, 485 U.S. 1, 7 n. 3, 108 S.Ct. 849, 855 n. 3, 99 L.Ed.2d 1 (1988) (concluding that association of landlords had standing based on pleadings that individual members would likely be harmed by rent ordinance). Thus TAB satisfies the first prong of the *Hunt* test.

The second prong of *Hunt* requires that TAB's pleadings and the rest of the record demonstrate that the interests TAB seeks to protect are germane to the organization's purpose. TAB was chartered to "represent the interests of its members on issues which may impact upon its members' businesses." Considering a very similar question in *New York State Club Association*, the United States Supreme Court held that: "[T]he associational interests that the consortium seeks to protect are germane to its purpose: appellant's certificate of incorporation states that its purpose is 'to promote the common business interests of its

[member clubs].'" 487 U.S. at 10 n. 4, 108 S.Ct. at 2232, n. 4 (bracketed language in original). Likewise, the interests TAB desires to protect are germane to the organization's purpose, and thus the second prong is met.

Under the third and final prong of the *Hunt* test, TAB's pleadings and the record must demonstrate that neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit. The Supreme Court has interpreted this prong as follows:

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.

*Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441 (quoting *Warth*, 422 U.S. at 515, 95 S.Ct. at 2213).

By seeking damages on behalf of its members, necessitating that each individual prove lost profits particular to its operations, the organization in *Warth* lacked standing to sue; rather, each individual member had to be a party to the suit. These facts are distinguishable from *Brock*, in which the union challenged an administrative interpretation of statutory provisions relating to unemployment compensation. 477 U.S. 274, 106 S.Ct. 2523. Recognizing that the suit raised "a pure question of law," and that "the individual circumstances" of any aggrieved member were not in issue, the Court held that the UAW had standing to challenge the government's actions. *Id.* at 287–88, 290, 106 S.Ct. at 2531–32, 2533; *see also Pennell*, 485 U.S. at 7 n. 3, 108 S.Ct. at 855 n. 3 (facial challenge to rent ordinance does not require participation of individual landlords). Here, TAB seeks only prospective relief, raises only issues of law, and need not prove the individual circumstances of its members to obtain that relief, thus meeting the third prong of *Hunt.*

Having found that TAB meets all three prongs of the *Hunt* test, we conclude that TAB has standing to pursue the relief it seeks in this case.

### II.   Open Courts

TAB contends that the forfeiture provisions of the statutes and regulations in question violate the open courts provision of the Texas Constitution by unreasonably restricting access to the courts. After the agency has found a party to be in violation of any of these statutes and regulations, the offender must either tender a cash deposit or post a supersedeas bond in the full amount of the penalties assessed, or forfeit the right to judicial review.[11]

Historically, we have recognized at least three separate constitutional guarantees emanating from our open courts provision. First, courts must actually be open and operating, so that, for example, the legislature must place every county within a judicial district. *Runge & Co. v. Wyatt*, 25 Tex.Supp. 294 (1860). Second, citizens must have access to those courts unimpeded by unreasonable financial barriers, so that the legislature cannot impose a litigation tax in the form of increased filing fees to enhance the state's general revenue, *LeCroy v. Hanlon*, 713 S.W.2d 335, 342 (Tex. 1986). Finally, meaningful legal remedies must be afforded to our citizens, so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress. *Sax v. Votteler*, 648 S.W.2d 661, 665–66 (Tex.1983).

Here the second guarantee is applicable. This is not a question of the abrogation of any well-established common law

---

11. In most other jurisdictions, such prepayment provisions are required only to stay execution of judgments and are not prerequisites to the right to appeal itself. *See* Gary Stein, *Expanding the* *Due Process Rights of Indigent Litigants: Will Texaco Trickle Down?,* 61 N.Y.U.L.REV. 463, 469 (1986).

cause of action,[12] just as it is not a question of the physical absence of a court to which a complaint may be brought. The issue before us is access to the courts. In previous cases involving this issue, we did not predicate our decision on whether the party whose access had been restricted was attempting to assert a common law cause of action. In *LeCroy,* for example, the court did not permit increased filing fees for statutory causes of action while denying them for common law claims. 713 S.W.2d 335. Likewise in *Dillingham v. Putnam,* when the court struck down a statute requiring a supersedeas bond as a condition of appeal, the court did not concern itself with whether the particular appeal being restricted involved a common law or statutory claim. 109 Tex. 1, 14 S.W. 303 (1890). Similarly, in the present case, the issue is simply whether the prepayment requirement is an unreasonable financial barrier to access to the courts in light of the state interest involved.

The stated purpose of the regulatory statutes at issue here is to protect our state's natural resources.[13] There is no question that this is an important state interest.[14] The state argues that the prepayment provisions further this interest by increasing the deterrent effect of the penalties and by aiding in their collection. The state maintains that a violator will be less deterred by an administrative penalty if it can delay payment without bond while appealing the case in the courts. The state also argues that delay may render the penalty uncollectible, as the violator may become insolvent.

In considering these rationales, we note that the prepayment provisions actually consist of two elements. First, the assessed penalty must be paid, or financial security provided, within thirty days; enforcement is not stayed pending any period of judicial review.[15] Second, if payment is not made or financial security provided within the thirty-day period, the right to judicial review is forfeited. We agree that the rationales advanced by the state justify the first of these elements. Requiring expeditious payment of the administrative penalties increases their effectiveness. The legislature, however, could have imposed the first element without the second. It could have provided the agency with the right to collection of assessed penalties unless a supersedeas bond is posted, yet provided for judicial review. The requirement of immediate payment, without the corresponding forfeiture provision, would not have implicated the open courts provision, as the charged party could have obtained judicial review regardless of payment. This approach would have been in accordance with the usual procedure governing appeals of trial court judgments. *See* TEX. R.APP.P. 40. Any litigant may appeal without superseding the trial court's judgment, but the mere pendency of an appeal does not stay enforcement of the judgment.[16]

---

**12.** Thus, contrary to Justice Doggett's reading of our opinion, the *Sax* test is inapplicable.

**13.** The Clean Air Act was implemented to "safeguard the state's air resources from pollution by controlling or abating air pollution and emissions of air contaminants...." TEX.HEALTH & SAFETY CODE § 382.002(a). The Texas Water Code was implemented to "maintain the quality of water in the state consistent with the public health and enjoyment ..." TEX.WATER CODE § 26.003.

**14.** The importance is evidenced by article XVI, section 59(a) of our constitution, which provides in relevant part that: "The conservation and development of all the natural resources of this State ... and the preservation and conservation of all such natural resources ... are each and all ... public rights and duties." TEX. CONST. art. XVI, § 59(a).

**15.** If the person charged does not make payment or post bond within thirty days, the agency may forward the matter to the attorney general for enforcement. TEX.HEALTH & SAFETY CODE § 382.089(c), § 361.252(m); TEX.WATER CODE § 26.136(k).

**16.** It has been argued that our procedure of allowing immediate enforcement of trial court judgments violates federal due process when the judgment debtor is financially unable to post a supersedeas bond and immediate enforcement will cause irreparable injury. *Texaco, Inc. v. Pennzoil Co.,* 784 F.2d 1133 (2d Cir.1986), *rev'd on other grounds,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). A similar argument could be fashioned under the Texas open courts provision, but TAB does not assert that argument here. TAB's open courts challenge centers not on the requirement of immediate payment, but

Our specific focus for purposes of our open courts analysis, therefore, is not whether the requirement of immediate payment is reasonable, but whether the forfeiture of the right of judicial review, if the penalties are not superseded, is reasonable.

We conclude that the forfeiture provision is an unreasonable restriction on access to the courts. While the requirement of prepayment or the posting of a bond to stay enforcement furthers the state's important environmental interests by creating a strong incentive for timely payment of the assessed penalties, the forfeiture provision serves no additional interest.[17] The state may accomplish its goals by enforcing the prepayment requirements without infringing on a party's right to its day in court. Accordingly, we hold that forfeiture sections of the statutes and regulations at issue facially violate our open courts provision.[18]

### III. Jury Trial

TAB also claims that the statutes empowering these agencies to assess civil penalties violate the right to a jury trial guaranteed by the Texas Constitution.[19] We disagree.

Article I, section 15 of our constitution [20] preserves a right to trial by jury for those actions, or analogous actions, tried to a jury at the time the constitution of 1876 was adopted. *E.g., State v. Credit Bureau of Laredo,* 530 S.W.2d 288, 291 (Tex.1975); *White v. White,* 108 Tex. 570, 196 S.W. 508 (1917); *Hatten v. City of Houston,* 373 S.W.2d 525 (Tex.Civ.App.—Houston 1963, writ ref'd n.r.e.); *Hickman v. Smith,* 238 S.W.2d 838 (Tex.Civ.App.—Austin 1951, writ ref'd). A jury trial is not mandated by this provision for any other judicial proceeding. *Id.*

In *Credit Bureau,* we concluded that a suit for civil penalties for violation of an injunction issued pursuant to the Texas Deceptive Trade Practices Act was analogous to the common law action for debt, tried to a jury at the time our constitution was adopted. 530 S.W.2d at 293. Thus, we held that the right to a jury trial for that action remained inviolate. *Id.* We observed in *Credit Bureau,* however, that in certain types of adversary proceedings the constitutional right to a jury trial does not attach. Among the proceedings we referred to are appeals from administrative decisions.[21] *Id.* (citing *State v. De Silva,* 105 Tex. 95, 145 S.W. 330 (1912), and *Texas*

---

on the forfeiture of judicial review if payment is not made.

**17.** Thus, contrary to Justice Doggett's assertion, we do not strike down the penalties themselves. Nothing in this opinion prohibits the state's collection of assessed penalties. We hold as violative of our open courts provision only the requirement that the penalties be paid as a condition to judicial review. Furthermore, *nothing* in our opinion requires that penalties already paid be refunded.

**18.** That the affected parties may be able to afford prepayment is irrelevant. The guarantee of constitutional rights should not depend on the balance in one's bank account.

**19.** TAB claims that the lack of a jury trial before the agency as well as the lack of a trial de novo violate article I, section 15. We limit our inquiry to the absence of a trial de novo because, as this court has said: "Trial by jury cannot be claimed in an inquiry that is non-judicial in its character, or with respect to proceedings before an administrative board." *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 561–62 (1916). Even if the right to a jury is denied before an administrative agency, the dis-

positive question is whether a trial de novo and the corresponding right to a jury trial is constitutionally required upon judicial review of the agency's decision. *See Cockrill v. Cox,* 65 Tex. 669, 674 (1886) ("The right of jury trial remains inviolate, though denied in the court of first instance [in civil cases], if the right to appeal and the jury trial on appeal are secured.") (bracketed language in original).

**20.** Article I, section 15, provides, in pertinent part:

The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency. * * *.

TAB has not presented in this court, as it did below, its complaint that the statutes and regulations also violate the right to jury trial under article V, section 10 of the Texas Constitution.

**21.** While the *Credit Bureau* court specifically referred to the broader jury trial provision in article V, section 10 when it discussed the administrative proceeding exception, that exception necessarily also applies to the narrower provision found in article I, section 15.

*Liquor Control Bd. v. Jones,* 112 S.W.2d 227 (Tex.Civ.App.—Houston 1937, writ ref'd n.r.e.)). Consistent with this noted exception in *Credit Bureau,* we conclude that these agencies' assessments of environmental penalties are not actions, or analogous actions, to those tried to a jury at the time the constitution of 1876 was adopted. To hold that these environmental statutes and regulations promulgated in the late 1960s merely parrot common law and statutory rights triable to a jury in 1876 would turn a blind eye to the emergence of the modern administrative state and its profound impact on our legal and social order. In the late 19th century, ours was primarily a sparsely-populated agrarian society. *See generally,* T.R. Fehrenbach, *Lone Star: A History of Texas and the Texans,* 279–324 (1983). By contrast, concentrated industrial activity and its by-products, including the wide-spread emission of pollutants, with their resulting potential for significant damage to our natural resources are phenomena of relatively recent origin. In response to such phenomena, regulatory schemes, such as those challenged here, were designed to balance mounting environmental concerns with our state's economic vitality. In 1876 no governmental schemes akin to these existed.[22] Thus, we conclude that the contested proceedings are not analogous to any action tried to a jury in 1876. Accordingly, we hold that no right to a jury trial attaches to appeals from administrative adjudications under the environmental statutes and regulations at issue here.[23]

22. We do not consider nineteenth century criminal nuisance laws comparable to modern environmental regulations. *See* 852 S.W.2d at 461.

23. Despite Justice Doggett's trumpeting of our constitution's guarantee of trial by jury, he agrees that the right does not attach under the circumstances of this case.

24. Justice Doggett contends that the basis for our jury trial holding is overbroad. Instead, he would have us adopt the "imperfectly employed" federal test first enunciated in *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). *Infra,* 852 S.W.2d at 464. The basis for our decision is more limited, aris-

We should not be misunderstood to say that the legislature may abrogate the right to trial by jury in any case by delegating duties to an administrative agency. Here, we simply reaffirm what this court held almost a half century ago, in *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961 (1945). In *Corzelius,* we concluded that certain judicial functions, including fact finding, may be delegated constitutionally by the legislature to administrative agencies in furtherance of the preservation and conservation of the state's natural resources. The decision in *Corzelius* was based on article XVI, section 59(a) of our constitution, which provides in relevant part: "The conservation and development of all the natural resources of this State ... and the preservation and conservation of all such natural resources ... are each and all ... public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto." TEX. CONST. art. XVI, § 59(a). "By the use of the broad language used in Article XVI, Section 59(a)," the court stated, "the Legislature is authorized to enact such laws as are necessary to carry out the purposes for which such constitutional amendment was adopted." *Corzelius,* 186 S.W.2d at 964.[24]

There is no doubt that the legislature delegated the power to assess these civil penalties to the Air Control Board and the Water Commission as a manifestation of the public's interest in preserving and conserving the state's air and water resources. That intent is apparent from the policy statements of the relevant statutes.[25]

ing as it does out of TEX. CONST. article XVI, section 59(a) and our decision in *Corzelius.*

25. The Clean Air Act proclaims:
   The policy of this state and the purpose of this chapter to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of public health, general welfare, and physical property of the people, including the aesthetic enjoyment of air resources by the public and the maintenance of adequate visibility.
   TEX.HEALTH & SAFETY CODE § 382.002. The Texas Water Code proclaims in relevant part:
   It is the policy of this state and the purpose of the subchapter to maintain the quality of

We conclude, therefore, that the delegation of the fact-finding function by the legislature to the Air Control Board and the Water Commission under this statutory scheme was within the legislature's constitutional authority.

Of course, the fact that no jury trial is provided by the legislature to an alleged violator of these environmental protection laws does not mean that the agencies' power to assess penalties is unbridled.[26] The Air Control Board and the Water Commission may act only within constitutional and statutory parameters.

For the reasons set out above, we reverse that portion of the trial court's judgment declaring that section 4.041 of the Texas Clean Air Act, sections 26.136 and 27.1015 of the Texas Water Code, and section 8b of the Texas Solid Waste Disposal Act and the rules and regulations promulgated under those statutes comport with the open courts provision of our constitution, article I, section 13. We declare that the requirement of a supersedeas bond or cash deposit paid into an escrow account as a prerequisite to judicial review under TEX. HEALTH & SAFETY CODE §§ 361.252(m) (first clause), 382.089(c) (first sentence), and TEX.WATER CODE § 26.136(k) (first sentence)

is unconstitutional. We affirm that portion of the trial court's judgment declaring that the listed statutes, rules, and regulations do not violate the jury trial provision of our constitution, article I, section 15.

Concurring and dissenting opinions by DOGGETT, GAMMAGE and SPECTOR, JJ.

HIGHTOWER, J., not sitting.

DOGGETT, Justice, concurring and dissenting.

*"Don't Mess With Texas"*

—*A motto that captures the Texas spirit.*

Texans understand the directive "Don't Mess With Texas"; the majority does not. If the mess is big enough, if the stench is strong enough, no matter how great the danger to public health and safety, an industrial litterer can "mess" with Texas without fear of immediate punishment or legally effective citizen action.

And what an occasion for permitting polluters to "mess" with Texas air and water. Our state tops the nation in total toxic emissions and ranks dead last among the fifty states in important measures of environmental quality.[1] Although last in air

---

water in the state consistent with the public health and enjoyment

. . . . .

TEX.WATER CODE § 26.003.

**26.** The actions of the agencies involved in this proceeding are subject to the Administrative Procedure and Texas Register Act (APTRA), which specifically affords a "full panoply of procedural safeguards" to a party to contested case before those agencies. *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.,* 571 S.W.2d 503, 507 (Tex.1978). These procedural safeguards include the right to notice, the making of a full record of the proceeding before the agency, the taking of depositions, the right to subpoena witnesses, the application of the rules of evidence, the preparation of proposal for decision and the filing of exceptions and briefs, as well as separately stated findings of fact and conclusions of law. TEX.CIV.STAT.ANN. art. 6252–13a § 19 (Vernon Supp.1993). Judicial review is provided by section 19(e) under the substantial evidence rule, which directs a reviewing court to reverse and remand the agency adjudication if the agency decision is:

1) in violation of constitutional or statutory provisions;

2) in excess of the statutory authority of the agency;
3) made upon unlawful procedure;
4) affected by other error of law;
5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or
6) arbitrary and capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

We have held that judicial review under AP-TRA based on the record developed before the agency "furnishes more assurance of due process and a surer means of determining whether an agency acted arbitrarily, capriciously and without due regard for the evidence." *Imperial Am. Resources Fund, Inc. v. Railroad Comm'n of Tex.,* 557 S.W.2d 280, 285 (Tex.1977); *see also, Southwestern Bell Tel. Co.,* 571 S.W.2d at 509.

**1.** Statistics compiled from data sent by companies to the Environmental Protection Agency show that in 1990 535.7 million pounds of toxic chemicals were released into the Texas environment, more than in any other state. Texas also ranked first in the release of chemicals known to cause both cancer and birth defects. *See*

and water cleanliness, Texas today becomes the first state to strike down the imposition of penalties by administrative agencies to enforce statutes protecting the environment. I dissent from today's manipulation of the law to paralyze anti-pollution efforts, tragically announced at a time when protecting the quality of the air we breathe and the water we drink is so critical.

Today's opinion delivers a double whammy to protection of our natural resources. Polluters are first shielded from swift punishment for harming our environment, and then the courthouse door is slammed shut in the face of Texans who organize to object. Incredibly, this second punch was not even sought by the corporate organization that brought this challenge; it was wholly designed by the majority during the three years that this cause has lingered in this court. Announced today is an easily manipulable "friends in, foes out" rule to prevent further actions by those who organize to protect taxpayers, consumers or the environment.

Through its broad writing designed to eviscerate administrative enforcement of our state's environmental laws, the majority has also created significant new uncertainties for a wide range of state governmental activity—tax collection is imperiled, laws to protect nursing home residents are effectively voided, and even a leading weapon in the war on drugs is threatened. At a time of budgetary crisis exacerbated by the majority's great misadventure in public school finance,[2] today's opinion raises a substantial question of whether the State will be required to return to those who despoil Texas millions of dollars in administrative penalties collected during the almost eight years this case has wandered through the judicial system.

This major blow to our environment is matched only by the threat to our system of justice lurking in the arcane language of today's opinion. Hidden within its lengthy legal mumbo-jumbo is an unprecedented blow to our jury system. The constitutional right of trial by jury, already suffering at the hands of this majority, is no longer inviolate; it may be abrogated at any time. Instead of walking into a courthouse, where a jury is guaranteed, citizens may be detoured to an administrative agency, to explain their problems to bureaucrats not directly answerable to the community.

Today precedent and tradition have been trampled as the majority's long-standing fear of ordinary people in our legal system has taken firm hold. The drafters of our Texas Constitution realized something that the majority has long ceased to appreciate—ordinary Texans can make an extraordinary contribution to our system of justice. The more their collective voice expressed in a jury verdict is disregarded, the more new barriers are contrived to shut them out of our system of justice, the less justice that system will offer.

## I. Open Courts

The ability of state agencies to enforce environmental laws through the assessment of administrative penalties is declared unconstitutional by the majority as contradicting our state guarantee of open courts. While concluding that TAB certainly has a right to judicial review on behalf of its members, I disagree that the statutory restrictions it challenges unreasonably restrict access to the courts.

Access to the courts is unquestionably a fundamental constitutional and common law right. Article I, section 13 of the Texas Constitution forms the nucleus of this protection:

Texas Citizen Action, *Poisons in Our Neighborhoods, Toxic Pollution in Texas,* Sept. 1992, at 1; *see also* John Sharp, Texas Comptroller of Public Accounts, *Texas at Risk: Environmental Hazards Threaten State's Air, Land, and Water,* Fiscal Notes Aug. 1991 (noting the release of about 800 million pounds of toxic substances in 1989). Additionally, only two states ranked below Texas in the American Public Health Association's Pollution Standard Index, based on data gath-

ered between 1989 and 1991. *See* American Public Health Ass'n, *America's Public Health Report Card: A State-by-State Report on the Health of the Public* 59 (1992).

2. *See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 537 (Tex.1992) (Doggett, J., dissenting).

The open courts provision specifically guarantees all litigants the right to redress their grievances—to use a popular and correct phrase, the right to their day in court. *This right is a substantial state constitutional right.*

*LeCroy v. Hanlon,* 713 S.W.2d 335, 341 (Tex.1986) (citations omitted). This court has a long history of assuring that the right of access remains guaranteed to Texas citizens.[3]

In *Sax v. Votteler,* 648 S.W.2d 661 (Tex. 1983), we required a litigant alleging an unconstitutional denial of access to the courts to show that: (1) a cognizable common law cause of action is being restricted and (2) the limitation is unreasonable or arbitrary when balanced against the purpose and basis of the statute. The majority today appropriately eliminates the first showing in certain cases. In some circumstances the distinction between common law and statutory causes of action clearly does not affect whether access to the courts has been denied.

The second part of the *Sax* test, however, continues to be applied in all open courts cases.[4] Thus, in determining whether the open courts provision of the Texas Constitution is violated by the requirement that administrative penalties be paid as a prerequisite to judicial review, we must balance two competing interests: the right of TAB's members to access to the courts and the state's concern with effective and timely enforcement of its laws protecting the environment. The majority today restates in rather vague terms this second prong: "whether the prepayment requirement is an unreasonable financial barrier to access to the courts in light of the state

interest involved." 852 S.W.2d at 449. As we held in *LeCroy:*

> Because a substantial right is involved, the legislature cannot arbitrarily or unreasonably interfere with a litigant's right of access to the courts. Thus, the general open courts provision test balances the legislature's actual purpose in enacting the law against that law's interference with the individual's right of access to the courts. *The government has the burden to show that the legislative purpose outweighs the interference with the individual's right of access.*

713 S.W.2d at 341 (citations omitted; emphasis supplied).

Applying this test, we have permitted certain restrictions on access to the courts, while disallowing others. *Compare LeCroy,* 713 S.W.2d at 341 (court filing fee unreasonably restricts access to judicial system), and *Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303 (1890) (supersedeas bond as prerequisite to appeal, without regard to ability to pay, unconstitutional), *with Clanton v. Clark,* 639 S.W.2d 929 (Tex.1982) (court may constitutionally dismiss suit for failure to timely file cost bond), and *Federal Crude Oil Co. v. Yount–Lee Oil Co.,* 122 Tex. 21, 52 S.W.2d 56 (1932) (requirement that franchise taxes be paid prior to filing suit upheld under article I, § 13); *compare Lucas v. United States,* 757 S.W.2d 687 (Tex.1988) (limitations on damages for medical malpractice unconstitutional), *with Rose v. Doctors Hosp.,* 801 S.W.2d 841 (Tex.1990) (same limitations upheld under open courts provision in wrongful death cases). I favor a more complete and predictable open courts analysis designed to discourage such anomalous results.

---

**3.** *See, e.g., H. Runge & Co. v. Wyatt,* 25 Tex. Supp. 291 (1860) (placement of counties within judicial districts); *Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303 (1890) (striking requirement of supersedeas bond as a prerequisite to appeal); *Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944 (1932) (requirement that city be notified of street defect within twenty-four hours of accident unreasonable restriction on right of access to courts); *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983) (striking statute of limita-

tions barring action of minor); *LeCroy,* 713 S.W.2d 335 (Tex.1986) (holding unconstitutional increased filing fees designed to generate state revenues).

**4.** Oddly, the majority asserts that "the *Sax* test is inapplicable" to today's open courts decision, 852 S.W.2d at 449 n. 12, even as it explicitly relies on the analysis used in *LeCroy,* which in turn applied the *Sax* test. Nor does the majority attempt to explain how its analysis today differs from that employed in *Sax* and *LeCroy.*

Today's implementation of the second prong of the *Sax* test demonstrates its malleability. After perfunctorily reciting the purpose of administrative penalties, the majority, without any further analysis, concludes that: "the forfeiture provision is an unreasonable restriction on access to the courts," 852 S.W.2d at 450, and "the forfeiture provision serves no additional [state] interest." *Id.* at 450. Enacted by the Legislature as an important means of enforcing our state's environmental laws, these penalties are today judicially extinguished. The majority determines that these laudable legislative objectives are not sufficiently "important" to justify the possibility that the use of penalties may perhaps someday impose some slight financial strain on some hypothetical polluter.

Whether examined under either the vague test employed today or my more exacting formulation, the majority's conclusory analysis suffers from at least three major flaws: (1) a failure to recognize the compelling interest, grounded in our state constitution, served by administrative penalties, including prepayment provisions; (2) a disregard of the extensive statutory constraints on penalty usage which represents the least restrictive means to achieve this purpose; and (3) an assumption that the prepayment provision interferes with individual access to the courts unsupported by even a single specific instance of such a restrictive effect.

The balancing required by *Sax* mandates careful consideration of the rights being affected. The more significant the right the litigant asserts, the more onerous the government's burden becomes. TAB has asserted a right to judicial review of penalties imposed against its members. This interest is encompassed within the right of access to the courts, which we declared a "substantial state constitutional right." *LeCroy,* 713 S.W.2d at 341.

The State has met its burden by demonstrating a compelling interest in employing administrative penalties reflected in constitutionally-guaranteed protection of our state's natural resources. Although not critical in overcoming an open courts challenge, a constitutional predicate for the state's interest is a highly persuasive factor in the balancing process. As declared in article XVI, section 59(a) [5]:

> [T]he preservation and conservation of all ... natural resources of the State are each and all declared public rights and duties; and the Legislature shall pass all laws as may be appropriate thereto.

This very mandate of the people, as well as protection of the public health and safety was effectuated in the Clean Air Act,[6] the Texas Water Code,[7] and the Solid Waste Disposal Act,[8] including the right to assess administrative penalties. Protection of Texas' air, water and land is undeniably a compelling interest.

5. This natural resources provision receives conflicting treatment in today's opinion, amply demonstrating both the malleability of the *Sax* test as applied by the majority and the majority's disdain for the right to trial by jury. While declaring that article XVI, § 59(a) will not permit payment of even the most modest penalties under our open courts provision, the majority inexplicably finds that it forms an insurmountable barrier to the right to jury trial. The majority makes no attempt to reconcile its inconsistent analysis of these constitutional guarantees.

6. Tex.Health & Safety Code § 382.002, provides that:

> It is the policy of this state and the purpose of this Act to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of health, general welfare, and physical property of the people, including the aesthetic enjoy-

ment of the air resources by the people and the maintenance of adequate visibility.

7. Tex.Water Code § 26.003, provides that:

> It is the policy of this state and the purpose of this subchapter to maintain the quality of water in this state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, the operation of existing industries, and the economic development of the state....

8. Tex.Health & Safety Code § 361.002, declares that:

> It is the policy of this state and the purpose of this Act to safeguard the health, welfare, and physical property of the people, and to protect the environment, through controlling the management of hazardous wastes, including the accounting for hazardous wastes generated.

The form of these particular administrative penalties has certainly been fashioned to serve this important state interest through the least restrictive means. Penalty usage is substantially limited and can in no way be said to be arbitrarily imposed. All three statutes at issue require that, once a violation is established, the agency assessing a penalty must consider such factors as the seriousness of the violation, including but not limited to the nature, circumstance, extent, and gravity of the prohibited acts; the hazard or potential hazard created to the public health or safety of the public; the history of previous violation; the amount necessary to deter future violations; and efforts to correct the violation.[9] There is thus statutory assurance that the amount of any resulting penalties will be directly related to the conduct.

Requiring that assessed penalties be paid, or a bond in the same amount be posted, prior to challenging the agency action in court is not unreasonable under these circumstances. Unlike the filing fee held violative of the open courts provision in *LeCroy*, the legislative purpose is not to raise money by making it more expensive for citizens to enforce their legal rights. Instead, the legislative objective is to *deter and punish* violations of the law that pose an environmental threat.

The wheels of justice grind slowly, with final resolution often years in reaching. Indeed, in this court they sometimes hardly grind at all. Clearly those willing to profit from polluting our natural resources will not hesitate to employ the delays in the judicial system to their advantage. A declaration of bankruptcy by a perhaps deliberately undercapitalized corporation during the pendency of a suit is likely to relieve the polluter of any responsibility to remedy the damage it has caused.

Showing no awareness of the purpose of and need for administrative penalties, the majority finds that "expeditious payment" is adequately guaranteed by the ability of the agency, through the attorney general, to initiate an enforcement action to collect the amount assessed. 852 S.W.2d at 449 & n. 15. In other words, the purpose of immediate deterrence of violation of environmental laws is ensured by the filing of a lawsuit that may take as many years to resolve as this case has. These agencies charged with protecting our natural resources have long had the ability to bring an enforcement action in state court. *See* Tex.Water Code § 26.123; Tex.Health & Safety Code § 382.081; *id.* § 361.224. The effort of the Texas Legislature to improve the effectiveness of enforcement through the use of administrative penalties is today rendered a nullity.

Given the time and expense that must be devoted to pursuing an enforcement action in court, the State will have the capability to proceed against only the most egregious wrongs. The vast majority of administrative penalties to date have been relatively small, reflecting technical yet important statutory violations.[10] In the absence of an administrative penalty power, most of these would have gone unpunished, even though collectively the environmental impact of small violations could be more profound than a major catastrophe. Relieving polluters from immediate sanctions dismantles the effectiveness of our laws protecting natural resources; no lesser means has been identified that provides for prompt enforcement. I would hold that the state has demonstrated a compelling interest in environmental protection that has been implemented by the least restrictive means, thus overriding any modest impediment that the prepayment of penalties may impose on access to the courts.

**9.** Tex.Health & Safety Code § 382.088(c)(1–5) (Clean Air Act), § 361.251(c)(1–5) (Solid Waste Disposal Act); Tex.Water Code § 26.136(c). The Texas Water Code imposes additional considerations, including "the impact of the violation on a receiving stream or underground water reservoir, on the property owners ... and on water users," as well as the extent of previous violations, the degree of culpability involved, any good faith effort to correct the violation and any economic benefit gained as a result of the illegal conduct. Tex.Water Code § 26.136(c).

**10.** See Appendices to Brief of Appellees Texas Air Control Board and Texas Water Commission.

Not even the slightest evidence has been provided to this court to suggest any actual restrictive effect. No affidavit of any member of the Texas Association of Business appears in the record stating that an inability to pay an administrative penalty has barred judicial review. As to most of the penalties assessed, $5,000 or less in amount, it is doubtful that such a contention could be made. The majority necessarily concludes that imposing fines of $2,000 against Exxon Chemical Company, Shell Oil Company and Union Carbide Corporation has left those entities financially unable to pursue an appeal.[11] While the enormity of some future penalty could in fact unconstitutionally bar judicial access, that is certainly not the case here. *See Jensen v. State Tax Comm'n*, 835 P.2d 965, 969 (Utah 1992) (payment of assessed taxes, penalties and interest as precondition to suit "not unconstitutional in all cases," but only those in which taxpayer financially barred from prosecuting appeal); *see also Morrison v. Chan*, 699 S.W.2d 205, 207 (Tex.1985) (medical malpractice statute of limitations not unconstitutional as applied to facts of case).

Eliminating the need to prove actual restrictive effect, the majority declares "irrelevant" that "the affected parties may be able to afford prepayment." 852 S.W.2d at 450 n. 18. Unexplained is how this statement can be reconciled with *Dillingham*, in which this court found of critical importance the failure to accommodate those financially unable to post a supersedeas bond as a prerequisite to judicial review. Opining that "the guarantee of constitutional rights should not depend on the balance in one's bank account," *id.*, the majori-

ty would accord our state's largest businesses the same treatment as indigents in avoiding financial responsibility for court and other litigation costs.

Nor is the majority restrained by Texas decisional law validating similar requirements. We long ago upheld against this same type of challenge the condition that a corporation pay its franchise taxes in order to file a court action. *Federal Crude Oil Co. v. Yount–Lee Oil Co.*, 122 Tex. 21, 52 S.W.2d 56 (1932); *accord Rimco Enterprises, Inc. v. Texas Elec. Svc. Co.*, 599 S.W.2d 362 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.). Various statutory requirements that taxes, penalties and interest be paid prior to contesting them in court have likewise sustained an open courts challenge. *See Filmstrips and Slides, Inc. v. Dallas Central Appraisal Dist.*, 806 S.W.2d 289 (Tex.App.—Dallas 1991, no writ) (property taxes); *Robinson v. Bullock*, 553 S.W.2d 196 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.), *cert. denied*, 436 U.S. 918, 98 S.Ct. 2264, 56 L.Ed.2d 759 (1978) (sales taxes).

The majority also ignores the certainty that far more than three statutes are impacted by today's decision. A broad range of regulatory enforcement programs vital to protection of the public health and safety will be stripped of their most timely and effective sanctions to deter harmful conduct. Laws designed to protect the old—residents in nursing homes [12]—the young—our children away at camp [13]—the sick and the injured,[14] and those we have lost [15] will be substantially weakened. Others, ensuring the sanitariness of food, drugs and cosmetics,[16] as well as the slaughter and

---

11. See Appendices to Brief of Appellees Texas Air Control Board and Texas Water Commission at 27, 44, 55.

12. *See* Tex.Health & Safety Code § 242.066 (administrative penalty for statutory violations "threaten[ing] the health and safety of a resident" of a convalescent or nursing home); *id.* § 242.069 (penalty must be prepaid or a bond posted prior to judicial review).

13. Tex.Health & Safety Code §§ 141.016–141.-018 (providing for administrative penalties for violation of laws regulating youth camps and

requiring their payment or the posting of a bond prior to judicial review).

14. Tex.Health & Safety Code §§ 773.065–.067 (administrative penalties to enforce Emergency Medical Services Act).

15. Tex.Rev.Civ.Stat.Ann. art. 4582b, § 6G (Vernon Supp.1992) (administrative penalties for violation of statutes governing funeral directing and embalming).

16. Tex.Health & Safety Code §§ 431.054–.056 (Texas Food, Drug & Cosmetic Act); *id.* § 466.-

disposition of dead animals,[17] will be similarly rendered less effective.[18] Even where such penalties have not been frequently enforced, their potential use may promote law enforcement.

The most widespread damage, however, from today's decision will be in the enforcement of laws protecting our environment, where the Legislature has determined again and again that such penalties are the most effective means of assuring compliance and preventing pollution of our air, water and land.[19] The majority ensures that those who pollute will be brought to justice very slowly or not at all.

Other statutes that impose administrative penalties permit the filing of an affidavit of inability to pay in lieu of prepayment or the posting of a bond.[20] Because the majority's reasoning strikes down administrative penalties without reference to financial ability, 852 S.W.2d at 451, these statutes similarly cannot be enforced.

Today's writing poses a potentially crippling effect for collection of taxes. All of our state statutes in this area require that assessed taxes, penalty and interest be prepaid before a suit challenging them may be filed. *See generally* Tex.Tax Code §§ 112.-051, 112.101. If such requirements are unconstitutionally void even to fulfill a constitutional mandate of environmental protection, their validity for tax collection is certainly subject to question. *See R Communications, Inc. v. Sharp,* 839 S.W.2d 947 (Tex.App.—Austin 1992, writ granted).

Nor has the majority sought to consider the consequences of its decision for a major weapon in the war against drugs, forfeiting *prior to judicial review* money, vehicles and other property alleged to have been used in violating our criminal laws. Tex. Crim.Proc.Code art. 59.02–.11. Most frequently invoked to seize assets from drug dealers, such as money and cars that could finance their defense, this statute provides for the return of property prior to trial only

043 (regulation of narcotic drug treatment programs).

**17.** Tex.Health & Safety Code §§ 433.094–.096 (Texas Meat & Poultry Inspection Act); *id.* §§ 144.081–.083 (Texas Renderers' Licensing Act).

**18.** *See also* Tex.Rev.Civ.Stat.Ann. art. 5069–51.17 (Vernon 1987 & Supp.1992) (administrative penalties for violation of the Texas Pawnshop Act).

**19.** Tex.Rev.Civ.Stat.Ann. art. 1446c, § 73A (Vernon Supp.1992) (permitting assessment of civil penalty for violation of Public Utility Regulatory Act "result[ing] in pollution of the air or water of this state or pos[ing] a threat to the public safety"); Tex.Rev.Civ.Stat.Ann. art. 4477–3a, § 16 (Vernon Supp.1992) (Texas Asbestos Health Protection Act); Tex.Rev.Civ.Stat.Ann. art. 5920–11, § 30 (Vernon Supp.1992) (Texas Coal Mining and Surface Reclamation Act); Tex.Rev.Civ.Stat.Ann. art. 6053–2 (Vernon Supp. 1992) (safety standards for transportation of gas and for gas pipeline facilities); Tex.Rev.Civ.Stat. Ann. art. 8905, § 9 (Vernon Supp.1992) (Water Well Pump Installers Act); Tex.Nat.Res.Code § 40.252 (Oil Spill Prevention and Response Act); *id.* § 81.0531–.0533 (assessment of penalties for violation of Railroad Commission statutes and rules "which pertain to safety or the prevention or control of pollution"); *id.* § 116.-143–.145 (violation of laws relating to compressed natural gas "result[ing] in pollution of the air or water of this state or pos[ing] a threat

to the public safety"); *id.* § 131.2661–.2663 (violations of Uranium Surface Mining and Reclamation Act "result[ing] in pollution of the air or water of this state or pos[ing] a threat to the public safety"); *id.* § 141.013–.015 (violation of geothermal resources regulations "pertain[ing] to safety or the prevention or control of pollution"); *id.* Tex.Water Code 13.4151 (regulation of water and sewer utilities); *id.* § 27.1013–.1015 (Injection Well Act); *id.* § 28.067 (regulation of water wells and mine shafts); *id.* § 29.-047 (Salt Water Haulers Act); *id.* § 33.009 (regulation of water well pump installers); Tex. Health & Safety Code § 372.004 (water saving performance standards); *id.* § 401.389 (Texas Radiation Control Act).

**20.** Tex.Ag.Code § 12.020(*l*) (violation of agricultural statutes); *id.* § 76.1555 (failure to comply with pesticide regulations); Tex.Water Code § 34.011 (irrigation regulation); Tex.Rev.Civ. Stat.Ann. art. 41a–1, § 21D(f) (Vernon Supp. 1992) (public accounting); Tex.Rev.Civ.Stat. Ann. art. 135b–6, § 10B(k) (Vernon Supp.1992) (Structural Pest Control Act); Tex.Rev.Civ.Stat. Ann. art. 5155, § 5(h) (Vernon Supp.1992) (labor wage laws); Tex.Rev.Civ.Stat.Ann. art. 5282c, § 23A(k) (Vernon Supp.1992) (Professional Land Surveying Practices Act); Tex.Rev. Civ.Stat.Ann. art. 6573a, § 19A(k) (Vernon Supp.1992) (Real Estate License Act); Tex.Rev. Civ.Stat.Ann. art. 9100, § 17(m) (Vernon Supp. 1992) (Texas Department of Licensing and Regulation).

on the posting of a bond for the full value. *Id.* art. 59.02(b).

Procedures within our judicial system are also threatened. Why is not the requirement that corporations and other organizations appear in court only through counsel a violation of the open courts provision, since the cost of retaining an attorney in most cases exceeds the average administrative penalty considered here?

Inadequately considered by the majority's opinion is its effect on the millions of dollars in administrative penalties that have already been paid under the statutes now declared unconstitutional. Yet, under the general rule that our decisions apply retroactively, past violators of environmental laws may stand to reap a substantial windfall.[21] In the firm grasp of this majority, "open courts" may have been rewritten to mean open coffers. While claiming that nothing in today's writing suggests that a refund is required, the majority apparently once again concludes that monies extracted by the state under the coercion of an unconstitutional system may be retained. *See Carrollton–Farmers Indep. Sch. Dist.*, 826 S.W.2d at 515–23 (holding tax unconstitutional, but requiring taxpayers to continue payment for two years).

The majority today throws a large wrench into the workings of the important administrative mechanism of our Texas government. By severely limiting enforcement powers, the majority leaves law enforcers little choice but to forego prosecution of law violators. Our laws designed to protect and conserve our natural resources are substantially weakened at the time their strength is most needed.

## II. Trial by Jury

The harm caused to our environment by today's writing is equalled only by the severe blow struck against our fundamental right of trial by jury. In holding that TAB and its members have no right to a jury trial, the majority employs an analysis that has far-reaching ramifications. While I recognize the need to accommodate the evolution of the administrative state, the history of this important guarantee mandates that only the narrowest of exceptions be permitted.

The ability of each individual to have a case heard by other members of the community is a vital part of our heritage and law. Long ago, Texans emphasized the paramount importance of this guarantee, stating in their grievances against the Mexican government:

> It has failed and refused to secure, on a firm basis, the right of trial by jury, that palladium of civil liberty, and only safe guarantee for the life, liberty, and property of the citizen.

The Declaration of Independence of the Republic of Texas (1836), *reprinted in* Tex. Const.app. 519, 520 (Vernon 1955). A strong guarantee of this right had been unsuccessfully sought in an 1833 draft constitution,[22] which was submitted to Mexico by Stephen F. Austin [23] and was later incorporated in the 1836 Texas Independence Constitution.[24]

The central role of the jury as a democratic institution was firmly recognized, indeed celebrated, in our early jurisprudence by the Supreme Court of the Republic of Texas:

> The institution of jury trial has, perhaps, seldom or never been fully appreciated. It has been often eulogized in sounding

---

**21.** Under recent and highly erratic writings determining retroactivity, of course, anything can happen. *See, e.g., Carrollton–Farmers Indep. Sch. Dist.*, 826 S.W.2d at 515–23; *Elbaor v. Smith*, 845 S.W.2d 240 (Tex.1992) (creating uncertainty by disapproval of a type of pre-trial agreements previously upheld by this court).

**22.** "The right of trial by jury, and the privilege of the Writ of Habeas Corpus shall be established by law, and shall remain inviolable." *Proposed Constitution for the State of Texas* art.

4 (1833), *reprinted in Documents of Texas History*, 80 (Ernest Wallace ed., 1963).

**23.** *See* Eugene C. Barker, *Stephen F. Austin, in The Handbook of Texas* 84 (Walter Prescott Webb ed., 1952).

**24.** Constitution of the Republic of Texas, Declaration of Rights, Section 9 (1836), *reprinted in* Tex. Const. app. 523, 536 (Vernon 1955), provided that "the right of trial by jury shall remain inviolate."

phrase, and often decried and derided. An occasional corrupt, or biased, or silly verdict is not enough for condemnation; and when it is said the institution interposes chances of justice and checks against venality and oppression, the measure of just praise is not filled. Its immeasurable benefits, like the perennial springs of the earth, flow from the fact that considerable portions of the communities at stated periods are called into the courts to sit as judges of contested facts, and under the ministry of the courts to apply the laws. . . . Let us then preserve and transmit this mode of trial not only inviolate, but if possible purified and perfected.

*Bailey v. Haddy*, Dallam 35, 40–41 (Tex. 1841).[25]

In 1845, expanding the scope of this right was the subject of spirited debate in the deliberations over the new constitution for statehood. In addition to the previous guarantee, which was carried forward in a new Bill of Rights,[26] further protection was included in the Judiciary Article. Tex. Const. art. IV, § 16 (1845). While under our national Constitution and those of almost all of our sister states trial by jury is available only for those actions that could have been brought at common law, the Texas Constitution since 1845 has also preserved that right in cases that historically would have been brought in equity. Thus, even when a private party seeks injunctive relief that will inure to the public's benefit, any derogation of the right to a jury nonetheless violates the Texas Constitution.

Urging support of the additional Judiciary Article guarantee, Convention President Thomas Rusk declared:

It is a dangerous principle to trust too much power in the hands of one man. Would it not be better to trust a power of this nature in the hands of twelve men, than to confide it to the breast of one?

William F. Weeks, *Debates of the Texas Convention* 268 (1846). He was opposed by John Hemphill, later the first Chief Justice of this court, who actually "preferred the civil law" system, *id.* at 271–73, and Jefferson County delegate James Armstrong, who insisted the new section would "operate very injuriously." *Id.* at 270. He declared:

It would be better, in my opinion, to leave it to the legislature to apply these things; it is enough for us to say in the constitution that the trial by jury shall be preserved inviolate. If we intend the jury to determine every thing, it would be better to dispense with the judge altogether, as a useless appendage of the court.

*Id.* Today it is this same fear of juries, fortunately rejected in 1845, that now unfortunately prevails.

The original language providing for trial by jury in the Judiciary Article of 1845 was retained in later constitutions, Tex. Const. art. IV, § 16 (1861), Tex. Const. art. IV, § 20 (1866), but was thereafter extended to "all cases of law or equity." Tex. Const. art. V, § 16 (1869). It took its final form in our present Constitution of 1876, which continues to afford not one but two assurances on this vital subject:

In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right to trial by jury. . . .

Tex. Const. art. V, § 10.

The right of trial by jury shall remain inviolate.

Tex. Const. art. I, § 15. Rather than keeping it "inviolate," the majority today severely violates this right.

*Steenland v. Texas Commerce Bank Nat'l Ass'n,* 648 S.W.2d 387, 391 (Tex.App.—Tyler 1983, writ ref'd n.r.e.); *see also Lopez v. Lopez,* 691 S.W.2d 95, 97 (Tex.App.—Austin 1985, no writ) ("trial by jury should be granted zealously by all the courts of this state").

**25.** In our time this great constitutional principle continues to be reaffirmed:

It is fundamental to our system of justice and the intention and policy of the law to permit all persons to have a trial by jury of disputed fact issues essential for a determination of [their rights]. The right of trial by jury is a valuable right which should be guarded jealously by all state courts.

**26.** Tex. Const. art. I, § 12 (1845) (retaining identical language from 1836 provision).

Our heritage is now rejected by the majority in favor of a deliberately overbroad writing that treats trial by jury as a mere anachronism. This is consistent with the majority's increasing disfavor of decision-making by ordinary citizens composed as a jury.[27] Today's opinion insists that our constitutional assurance of trial by jury does not offer protection against legislative delegation of factfinding to an administrative bureaucracy. In essence, the majority engages in a massive redistribution of power from the people to the bureaucratic arm of state government. This extreme position is totally unjustified in view of the staunch legal and historical underpinnings of our constitutional commitment to afford Texans a jury of their peers.

Today's opinion accurately describes one element of the dual constitutional protection for this fundamental liberty:

> Article I, section 15 of our constitution preserves a right to trial by jury for those actions, or analogous actions, tried to a jury at the time the constitution of 1876 was adopted.

852 S.W.2d at 450 (footnote omitted). Then the majority grossly misconstrues this standard while making selective and misleading use of jurisprudence developed under the further guarantee of article V.

With its hangnail sketch of Texas history limited to one historian's very generalized description of Texas in the era "between 1835 and 1861",[28] 852 S.W.2d at 450, the majority ignores our longstanding concerns regarding threats to our natural resources. As early as 1860, the Legislature acted to penalize polluters, providing that:

> If any person ... shall in anywise pollute, or obstruct any water course, lake,

pond, marsh or common sewer, or continue such obstruction or pollution so as to render the same unwholesome or offensive to the county, city, town or neighborhood thereabouts, or shall do any act or thing that would be deemed and held to be a nuisance at common law, shall be ... fined in any sum not exceeding five hundred dollars....[29]

In an early decision considering whether a criminal nuisance was posed by a tallow factory near Galveston at which cattle were slaughtered and their carcasses and offal were allowed to accumulate, this court stated:

> It requires no aid of the common law to convince any one accustomed to pure air, and who has been brought by accident or necessity within the sickening and malarious influence of one of our modern tallow and beef factories, that it is a disgusting and nauseous nuisance, even for miles around it ... [those] so offending should be indicted and punished to the extent of the law.

*Allen v. State*, 34 Tex. 230, 233–34 (1871). How significantly has this court's once vigorous enforcement of anti-pollution laws waned.

Defilement of the environment was not only made punishable as a crime, but also subject to a common law action for nuisance. *See generally* Horace Wood, Wood's Law of Nuisances 501–21, 576–692 (2d ed. 1883) (discussing nuisance recovery at common law for various forms of air and water pollution). Such actions were regularly brought in Texas before 1876 to halt activities harmful to our air and water. In 1856, this court recognized that "[w]hat constitutes a nuisance is well defined."[30]

---

**27.** *See, e.g., May v. United Services,* 844 S.W.2d 666, 674 (Tex.1992) (Doggett, J., dissenting); *Boyles v. Kerr,* 1992 WL 353277 (Tex.1992) (Doggett, J., dissenting); *Leleaux v. Hamshire–Fannett Indep. Sch. Dist.,* 835 S.W.2d 49, 55–56 (Tex.1992) (Doggett, J., dissenting); *Reagan v. Vaughn,* 804 S.W.2d 463, 491 (Tex.1991) (Doggett, J., concurring and dissenting); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting).

**28.** T.R. Fehrenbach, Lone Star: A History of Texas and the Texans 279 (1983).

**29.** Act of Feb. 11, 1860, Tex.Gen Laws 97, a later version of which was referenced by this court in *Gulf, Colo. & Santa Fe Ry. v. Reed,* 80 Tex. 362, 15 S.W. 1105, 1107 (1891).

**30.** The court further stated: "The word means, literally, annoyance; in law, it signifies, according to Blackstone, 'anything that worketh hurt, inconvenience, or damage.'.... 'So closely (says Blackstone) does the law of England enforce that excellent rule of Gospel morality, of doing to others as we would they should do unto ourselves.'" *Id.* at 492. *Accord Miller v. Burch,* 32 Tex. 208, 210 (1869).

*Burditt v. Swenson,* 17 Tex. 489 (1856). Considering an action to enjoin operation of a livery stable on Congress Avenue in Austin because "manure and filth has already accumulated to such an extent, that it now causes an unhealthy and disagreeable effluvia, exceedingly offensive and prejudicial," *id.* at 492, this court concluded such "noisome smells" constituted a nuisance. *Id.* at 502–03. In *City of Fort Worth v. Crawford,* 74 Tex. 404, 12 S.W. 52, 54 (1889), an individual asserted that, because of the dumping of garbage, filth and bodies of dead animals on city land,

> his home was rendered almost uninhabitable; his family and himself were kept in bad health; and he was, in the language of a witness, "a walking skeleton."

This court further observed that

> The stench was so offensive that he had to shut the doors to eat and sleep.... The testimony shows that the filth on this place of deposit was so indescribable, and was so offensive as to make persons sick, and could be perceived a mile away.

*Id.* Affirming the judgment declaring the dump a common law nuisance, this court declared:

> There is also no doubt that every person has a right to have the air diffused over his premises free from noxious vapors and noisome smells....

*Id.*[31]

The majority's suggestion that "pollutants ... are phenomena of relatively recent origin," 852 S.W.2d at 451, is contradicted by the nineteenth century legislative response of criminalizing pollution and the common use of the common law of nuisance to fight soiling of the air and water. With the ongoing construction of the railroads, the mining of coal and sulphur, the emergence of industry and the nascence of our oil and gas industry, our state's natural resources were by no means pure and unthreatened in 1876. *See* James C. Cobb, Industrialization and Southern Society 1877–1984, 128 (1984) (describing pollution relating to increased rail usage, lumbering and urban sewage); *see also* Robert A. Calvert & Arnoldo De Leon, The History of Texas 186–191 (1990) (discussing the development of Texas industry in the late 1800's, including lumbering, beef processing and mining); Louis J. Wortham, 5 A History of Texas (1924) (examining industrial development in the nineteenth century). Only the scope and depth of the problem has changed. But even if the fouling of the environment were a recent technological "innovation" of the past century, that would be irrelevant. As I recently wrote in another context,

> The law is not irretrievably locked in the days before televisions and videocameras, nor limited to operators of telegraphs and horse-drawn carriages.

*Boyles v. Kerr* (Tex.1992) (Doggett, J., dissenting). There is nothing about technological change that has made trial by jury any less vital.[32]

But because there was no modern bureaucracy in 1876, the majority insists: "no governmental schemes akin to these existed." *Id.* at 451. While our laws and society have grown more complicated, the man-

---

**31.** *See also Rhodes v. Whitehead,* 27 Tex. 304, 316 (1863) (remanding for trial a complaint against a dam across the San Antonio river, recognizing that the creation "of pools of stagnant and putrid water" or the "tendency to cause sickness in [the plaintiff's] family or immediate neighborhood," was sufficient to constitute a nuisance); *Jung v. Neraz,* 71 Tex. 396, 9 S.W. 344, 344–45 (1888) (nuisance properly alleged by claim that "interment of dead bodies in [proposed cemetery] would infect, poison, and injure [plaintiffs'] wells, and the use of low grounds, and further injure plaintiffs' health by the foul odors from the decomposition of said bodies.").

**32.** Although some critics allege that juries are not competent to deal with complex scientific and technological issues, empirical data demonstrates otherwise.

> Research shows ... that the opportunity exists for meaningful [juror] participation in a wide range of adjudicatory and regulatory proceedings.... To the extent that juries encounter difficulties, these difficulties often vex judges as well.... The full potential of lay participation in adjudication has not been realized.

Joe Cecil, Valerie Hans, and Elizabeth Wiggins, *Citizen Comprehension of Difficult Issues: Lessons From Civil Jury Trials,* 40 Am.U.L.Rev. 727, 773–74 (1991).

date of our constitution has not. As we concluded in *State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 292 (Tex. 1975): "The right to a trial by jury is not limited to the precise form of action ... at common law." If there was an analogous cause of action with a right to jury trial in 1876, then our article I jury trial guarantee requires it today. Yet the majority ignores the fact that even the earliest of pollution statutes was designed to deter and punish those who harm our environment. Our jury trial article is thus decreed as dependent on form, not substance; not analogy, but exactitude. Under the majority's analysis, *Credit Bureau* was wrongly decided since a regulatory prohibition against deceptive non-disclosure or ambiguous language with the capacity to deceive was beyond the "deceptive acts" of common law fraud or deceit as it existed in 1876.

Seizing upon the rather obvious proposition that the administrative state had not yet been created in 1876, the majority concludes that there is no right to trial by jury in judicial review of an administrative proceeding. But under article I it is the nature of the cause of action that controls, not the procedures under which it is enforced. Each of the three statutes considered today defines "pollution" of air, water or land to incorporate early nuisance concepts. Tex. Health & Safety Code § 382.-003(3) (contaminants that "are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property [or] interferes with the normal use and enjoyment of animal life, vegetation, or property"); *id.* § 361.003(44) ("contamination of any land land or surface or subsurface water in the state that renders the land or water harmful, detrimental, or injurious to humans, animal life, vegetation"); Tex. Water Code § 26.001(13) (contamination that "renders the water harmful, deterimental, or injurious to humans, animal life, vegetation, or property"). The majority fails to examine these provisions and makes no attempt to distinguish their substance from nuisance actions at the time the constitution was adopted. The focus must be on the nature of civil and criminal nuisance actions as

they existed in 1876, not on whether administrative agencies existed then to bring such actions. That the creation of some administrative agency was not contemplated in 1876 does not mean that any type of factfinding transferred to that agency in 1993 or hereafter is beyond the purview of a jury. With its new approach, the majority is only clearing the way for a steady expansion of factfinding and decisionmaking by bureaucracy at the expense of trial by jury.

Concluding that no common law action analogous to the assessment of administrative penalties existed in 1876, the majority professes a superficial limit on its holding tied to article XVI, § 59(a) of the Texas Constitution, as interpreted in *Corzelius v. Harrell*, 143 Tex. 509, 186 S.W.2d 961 (1945). 852 S.W.2d at 451 n. 24. Nothing in this provision affects the determination of whether a nuisance action for pollution is analogous to an enforcement action for the same conduct. Clearly, the majority's reasoning rests solely on the fact that no administrative agency was charged in 1876 with protecting the state's resources. Nor does *Corzelius* in any way address the right to jury trial. Under the majority's asserted "narrow" holding, the right to trial by jury can be immediately abrogated in any case in which natural resources are even remotely involved, including private disputes that this court has held are subject to jury trial, such as those involving mineral ownership, contract rights, or mineral lease terms. *See, e.g., Amarillo Oil Co. v. Energy–Agri Prod., Inc.*, 794 S.W.2d 20, 26 (Tex.1990).

The constitutional limitation on legislative power to delegate away the people's right to trial by jury was amply demonstrated by the writing of this court in *White v. White*, 108 Tex. 570, 196 S.W. 508 (1917). There a husband had his wife, who apparently did not contest that she was a "lunatic," committed to a state asylum. Commitment proceedings had been statutorily transferred to a "commission" appointed by a county judge and comprised of six members, "as many of [whom] shall be physicians as may be possible." Act of

April 8, 1913, 33rd Leg., ch. 163, art. 152, 1913 Tex.Gen.Laws 342. Although a review of decisions of other states and of federal practice indicated substantial support for what appeared to be a quite reasonable legislative attempt to entrust the determination of mental competency to the expertise of the medical profession, 196 S.W. at 514–15, this Court rightly concluded there that

> trial by jury means something more than a hearing before a commission....

*Id.* 196 S.W. at 511. Such "a hearing before a commission, in lieu of the time-honored trial by jury, is invalid." *Id.* 196 S.W. at 515. Moreover,

> [contrary] reasoning [in other jurisdictions] as to the right of the legislature to dispense with jury trials is not applicable to our judicial system and laws, and it is obnoxious to our [Texas] Constitution...."

*Id.* I maintain that the wholesale transfer of authority for factfinding from juries to the bureaucracy announced here is no less offensive to the rights our Constitution guarantees.

Beginning with the constitutional amendment that led to the creation of the Railroad Commission,[33] the use of administrative agencies in Texas has steadily increased. Today this arm of government implements broad legislative plans regulating many areas of public concern, including the conduct of public utilities, the development and conservation of energy resources, and the protection of the environment.

To preserve the workings of modern government, some exception for administrative proceedings may be necessary, but it should be drawn narrowly so as not to encompass every conceivable action that could arguably be assigned to some existing or future administrative body. And that is precisely what, until today, our Texas courts have usually done. In two decisions concerning administrative cancellation of a permit to sell liquor, courts nar-

rowly recognized that no "cause of action" was involved. The court in *Bradley v. Texas Liquor Control Bd.*, 108 S.W.2d 300 (Tex.Civ.App.—Austin 1937, writ ref'd n.r.e.), specifically excluded from its ruling cases "based upon a civil right of [an individual] to compensation." Relying on *Bradley*,[34] the court in *Texas Liquor Control Bd. v. Jones*, 112 S.W.2d 227, 229–30 (Tex.Civ.App.—Texarkana 1937, no writ), noted that unlike other administrative proceedings that might involve rights of the same character as a "cause of action," the cancellation of a liquor license is a proceeding brought by the state pursuant to its police power to protect the "welfare, health, peace ... and safety of the people of Texas."

This concern for "the safety of the people of Texas"—the rights and needs of the public, *id.*, is not dissimilar from the doctrine of "public rights" rather imperfectly employed by the federal courts. State cancellation of a liquor license essentially represents a "public right." In *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), the court distinguished between cases involving governmental action to protect the public health and safety and those involving only private rights:

> At least in cases in which "public rights" are being litigated—e.g., cases in which the government sues in its sovereign capacity to enforce public rights created by statutes ... [the constitutional right to a jury trial] does not prohibit ... assign[ment of] the factfinding function to an administrative forum with which the jury would be incompatible.

*Id.* at 450, 97 S.Ct. at 1266.

*Bradley* and *Jones* are also consistent with writings in other jurisdictions strictly excluding from any administrative public rights exception actions invoking private

**33.** *See* Tex. Const. art. X, § 2 and interp. commentary (Vernon 1955) (noting that the provision was added to authorize the Legislature to regulate railroads after the people had issued strong complaints against them).

**34.** *See also State v. De Silva*, 105 Tex. 95, 145 S.W. 330 (1912) (also holding that cancellation of liquor license is not a "cause").

rights for which the Constitution mandates a right to trial by jury:

> Although the award of general compensatory damages may have substantive effect, in that it deters violation of the regulatory scheme ... when the damages awarded advance a substantial private interest in remuneration that is disproportionate to the concept of public relief, the right to a jury trial is implicated and a jury is required.

*McHugh v. Santa Monica Rent Control Bd.*, 49 Cal.3d 348, 261 Cal.Rptr. 318, 344, 777 P.2d 91, 117 (1989) (Panelli, J., concurring); *Bishop Coal Co. v. Salyers*, 181 W.Va. 71, 380 S.E.2d 238, 246 (1989) (subjective determinations of damages are constitutionally entrusted to juries); *Broward County v. La Rosa*, 505 So.2d 422, 424 (Fla.1987) (constitutional right to jury precludes administrative awards of unliquidated damages).

Fortunately the rights of Texans are not constrained by whether the right to a jury trial was preserved in analogous actions in 1876. We have written quite clearly that an even broader right to trial by jury is afforded under article V, section 10 than under article I, section 15.[35] *State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 292 (Tex.1975). Relying on *Walsh v. Spencer*, 275 S.W.2d 220, 223 (Tex.Civ. App.—San Antonio 1954, no writ), which described the "much broader guarantee" of the Judiciary Article, and *Tolle v. Tolle*, 101 Tex. 33, 104 S.W. 1049, 1050 (1907), which said of the provision, "[l]anguage cannot be more comprehensive than this,"

we expressly disapproved of earlier cases "mistakenly" treating the two provisions as identical in meaning, that is, as protecting the right of trial by jury only as it existed at common law or by statutes in effect at the time of the adoption of the Constitution.

530 S.W.2d at 292 (citing *Hickman v. Smith*, 238 S.W.2d 838 (Tex.Civ.App.—Austin 1951, writ ref'd), as improperly assigning the two provisions equivalent meaning). We held that the Judiciary Article affords a unique right to trial by jury even for causes of action unknown at the time of the Constitution's adoption. *Id.*[36]

Instead of heeding this holding, the majority seizes upon a citation to a commentary in that writing as an excuse to rewrite the Constitution. In the discussion of the article V jury trial guarantee in *Credit Bureau*, which involved no administrative action, we noted a few "isolated" proceedings that do not constitute a "cause" that have been identified on a "case-by-case determination." *Id.* at 293. We made shorthand reference to a commentator's brief list of exceptions carved from the otherwise inviolate right to trial by jury. *Id.* (citing Whitney R. Harris, *Jury Trial in Civil Cases—A Problem in Constitutional Interpretation*, 7 Sw.L.J. 1, 8 (1953) (listing child custody by habeas corpus and adoption proceedings, election contests, and contempt proceedings)). Additionally, Harris relied upon *Jones* for the broader proposition that proceedings originally brought before administrative agencies are excepted from constitutional jury rights. 7 Sw. L.J. at 12–13.[37]

---

**35.** In the commentary for recommended article V, section 14(e) of the proposed 1974 Constitution, the significance of holdings regarding this more expansive language was also noted:

> [T]he right of trial by jury guaranteed in Article V, Section 10 of the 1876 Constitution is not dependent on the existence of the right at the time the Constitution was adopted in 1876. The guarantee extends to any "cause" instituted in the district court. A "cause" is defined as a suit or action concerning any question, civil or criminal, contested before a court of justice.

See Texas Constitutional Revision Commission, *A New Constitution for Texas: Text, Explanation, Commentary* 120–21 (1973).

**36.** The *Credit Bureau* opinion was authored for the court by now former Chief Justice Jack Pope, who had written previously, "[t]he struggle for survival by the institution we call the jury is truly the epic of our law." Jack Pope, *The Jury*, 39 Tex.L.Rev. 426 (1961). That struggle continues today.

**37.** Though he wrote in unnecessarily global terms regarding this exception, even Harris recognized that

> [t]he plain language of the Judiciary section conferring the right of trial by jury in all causes in the district courts would seem to entitle parties to jury trials irrespective of whether that right existed at the time of the adoption of the Constitution.

Harris, *supra*, at 6–7.

Today the majority overexpands this exception before considering the rule it prefers that exception to swallow. In *Credit Bureau* we attributed "broad meaning [to] the word 'cause.'" 530 S.W.2d at 292. In defining it, we did not limit its meaning in the past, but turned to a relatively contemporary dictionary as well as older authority. *Id.* Clearly this term must adapt to modern developments; our understanding of a "cause" is not frozen in 1876. *See Davenport v. Garcia*, 834 S.W.2d 4, 19 (Tex.1992). Both the text of our Constitution and its historical backdrop demand that the right to trial by jury remain "inviolate." When, as here, however, changing circumstances require reexamination of the scope of this right in order to preserve the evolved workings of government, we must ensure that any exception does not destroy the guarantee.[38] We should instead follow the command of our Constitution in light of our contemporary situation, by limiting any exception in the most narrow way possible without completely undermining the administrative state.

I would accordingly clarify any existing exception for administrative proceedings to preserve the right to trial by jury in all suits except those in which the state is enforcing a regulation or statute protecting the public. If construed too broadly, however, even this exception limited to "public rights" could destroy our traditional reliance on the jury system.[39] Indeed, despite the writing in *Atlas Roofing*, such erosion has already begun at the federal level.[40] Properly limited, however, a "public rights" administrative exception to the right to trial by jury is both constitutionally sound and easy to apply. While perhaps far-reaching in other contexts, "public rights" that conflict with the right of each member of the public to have factual disputes resolved by a public jury must be narrowly construed. I would not permit the concept of "public rights" to be perverted to deny such a fundamental right. In this limited circumstance, I would define proceedings involving "public rights" as those in which the government, as a real party in interest, enforces a regulatory or statutory scheme. Contrary to the majority, I do not suggest that we follow its standard preference for copying a "federal test," 852 S.W.2d at 451 n. 24. Rather, I recommend a narrow and clear Texas standard that looks to Texas law predating *Atlas Roofing*, and which learns from the misapplication of this doctrine in the federal courts.

Here TAB's members are not entitled to a jury trial because the state is enforcing public regulations by imposing administrative penalties. Although this action is analogous to a common law nuisance claim, here the state is protecting the public's right to a clean environment rather than an

---

**38.** The majority notes the existence of other statutory procedural protections, such as those contained in the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat. art. 6252-13a, § 19(e). 852 S.W.2d at 452, n. 26. While important, these measures certainly do not constitute a complete substitute for a jury trial. If the Texas Constitution guarantees a right to trial by jury, no lesser protection will suffice.

**39.** To some extent every action legislatively entrusted to an administrative agency involves a public right. At the same time even actions by private parties may have incidental regulatory effects and are unquestionably invested with a public interest. *See The Dallas Morning News, Inc. v. Fifth Court of Appeals*, 842 S.W.2d 655, 663 (Tex.1992, orig. proceeding) (Doggett, J., dissenting from overruling of motion for leave to file petition for writ of mandamus).

**40.** The "public rights" concept has been recently muddled by the federal courts. In *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the court, although upholding the right to a jury trial for defendants sued for fraudulent conveyance by a trustee in bankruptcy, broadened the scope of its "public rights" exception to include all cases "involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency." *Id.* at 55 n. 10, 109 S.Ct. at 2797 n. 10. *See also Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 586, 105 S.Ct. 3325, 3335, 87 L.Ed.2d 409 (1985) (rejecting the view that the government must bring suit in order for litigation to involve "public rights"). I believe that such an expansive reading of "public rights" would not be consistent with the broad state constitutional protection of the right to trial by jury in Texas.

individual's use and enjoyment of private property.

The right to trial by jury is a critical state constitutional guarantee. Denigrating my concern with protecting this liberty, the majority dismisses my writing as "trumpeting." 852 S.W.2d at 451 n. 23. The trumpet call has sounded from the very earliest days of our Republic, heralding our right to trial by jury, a clarion to our citizens to shout out to preserve their heritage against attack. It demands that any intrusion on this right be narrow in scope, clearly-announced and thoughtfully considered. The majority's refusal to define with certainty its erosion of the right to trial by jury sounds a weak and shaky chord, reflecting a lack of commitment to this fundamental guarantee. Attempting to let the strong note drown the weak, the majority seeks to hide its equivocation by reference to my conclusion that a jury trial is not required under these anti-pollution statutes, *id.*, and by criticizing the narrow, clear and thoughtful exception I have drawn today. *Id.*

The inviolate nature of the right to trial by jury demands that this vital guarantee be circumscribed in only the most extraordinary circumstances and that any exception to it be clearly and narrowly construed. Although I do not disagree with the result announced by the majority, the analysis employed is designed to destroy one of our most precious freedoms as Texans. The alternative I offer would permit our administrative bodies to implement efficiently their regulations, while ensuring that efficiency concerns do not envelop a fundamental civil liberty.[41]

### III. Standing

The issue of standing is a stranger to this litigation. No party before this court has ever asserted that the Texas Association of Business lacked capacity to challenge the actions of state government. How rare the occasion when all litigants agree on the proper resolution of an issue, but how truly extraordinary is such unanimity when the parties are two state regulatory agencies, the Texas Association of Business, the Sierra Club and the League of Women Voters. This, nonetheless, is the exceptional circumstance in which we find ourselves today as all of these diverse parties have urged the court not to decide this matter in the manner adopted. Addressing the question of standing solely at the belated insistence of the majority, all parties asserted that this issue was not in dispute; that, under recent precedent, standing had been waived;[42] and, alternatively, that the record adequately demonstrated the right of the Texas Association of Business under Texas law to initiate this litigation. Why then does the majority insist on writing? Because it dare not pass up the opportunity to close access to our courts to those citizens who choose to challenge environmental degradation, neighborhood destruction and consumer abuse. Through a narrowly crafted test, the majority extends an invitation to TAB to come into the courts while telling other public interest groups to stay out.

While devoting over half of today's opinion to a nonissue in this litigation, the majority oddly limits its inquiry to only one of the three organizations asserting standing here. Nothing is said as to the League of Women Voters and the Sierra Club, both of which intervened in the trial court and were aligned as defendants with the State. Asserting the interests of its members in water and air quality, as well as its involvement in protecting the state's natural resources, the League of Women Voters claimed standing to defend the challenged regulations. Similarly, the Sierra Club

---

**41.** In view of recent attacks nationwide on the jury system, a recent study determined that
> Our central conclusion is that the civil jury system is valuable and works well.... It is [not] "broken," and therefore it need not be "fixed." The jury system is a proven, effective, an important means of resolving civil disputes.

The Brookings Institution, *Charting a Future for the Civil Jury System* 2 (1992).

**42.** As the majority recognizes, "the parties insist that any question of standing has been waived in the trial court and cannot be raised by the court for the first time on appeal." 852 S.W.2d at 443–444.

based its standing on its purpose of environmental enhancement and conservation of natural resources. By completely ignoring whether these groups were proper parties and by embracing a federal standing test hostile to their participation, the majority erects new barriers to deny Texans access to Texas courts.

To achieve this result, the majority must overcome what, until recently, was viewed as a considerable obstacle—Texas law. This court has repeatedly held that the issue of standing may not be raised for the first time on appeal, either by the parties or by the court. In *Texas Industrial Traffic League v. Railroad Comm'n of Texas*, 633 S.W.2d 821, 822–23 (Tex.1982), we concluded:

> A party's lack of justiciable interest must be pointed out to the trial court ... in a written plea in abatement, and a ruling thereon must be obtained or the matter is waived.

> No plea challenging the standing of [the party] was filed in the district court. *The issue of standing was therefore waived, and the court of appeals erred in writing on the issue at all.*

(Emphasis supplied). The sole issue presented in *Coffee v. William Marsh Rice University*, 403 S.W.2d 340 (Tex.1966), was whether the court of appeals erred in dismissing a case, on its own motion, for want of standing. This court held that, because standing had not been challenged in the trial court, that issue could not deprive the court of appeals of subject matter jurisdiction. *Id.* at 347–48. Assuming that standing was lacking in *Sabine River Authority of Texas v. Willis*, 369 S.W.2d 348, 349–50 (Tex.1963),[43] this court nonetheless held that dismissal was erroneous, because the absence of a justiciable interest was not first raised in the trial court. We have repeatedly cited these decisions with approval. *See Central Educ. Agency v. Burke*, 711 S.W.2d 7, 8 (Tex.1986) (per curiam); *American General Fire & Casualty Co. v. Weinberg*, 639 S.W.2d 688 (Tex. 1982); *Cox v. Johnson*, 638 S.W.2d 867, 868 (Tex.1982) (per curiam).

Time and time again, the courts of appeals have also refused to consider challenges to standing not first raised in the trial court.[44] Until today, the only criticism of our prior holdings to this effect has

---

**43.** Despite the clear statement in *Sabine River* that "[w]e assume without deciding that Sabine has no justiciable interest," 369 S.W.2d at 349, the majority today asserts that "standing was present" in the trial court in that case. 852 S.W.2d at 446 n. 9.

**44.** *See, e.g., Espiricueta v. Vargas*, 820 S.W.2d 17, 20 (Tex.App.—Austin 1991, writ denied); *Integrated Title Data Systems v. Dulaney*, 800 S.W.2d 336 (Tex.App.—El Paso 1990, no writ); *State v. Euresti*, 797 S.W.2d 296, 299 (Tex.App.—Corpus Christi 1990, no writ); *Cissne v. Robertson*, 782 S.W.2d 912, 917 (Tex.App.—Dallas 1989, writ denied); *Broyles v. Ashworth*, 782 S.W.2d 31, 34 (Tex.App.—Fort Worth 1989, no writ); *Horton v. Robinson*, 776 S.W.2d 260, 263 (Tex.App.—El Paso 1989, no writ); *L.G. v. State*, 775 S.W.2d 758, 760 (Tex.App.—El Paso 1989, no writ); *Wilson v. United Farm Workers of America*, 774 S.W.2d 760, 764 (Tex.App.—Corpus Christi 1989, no writ); *Smiley v. Johnson*, 763 S.W.2d 1, 4 (Tex.App.—Dallas 1988, writ denied); *Ex Parte McClain*, 762 S.W.2d 238, 242 (Tex.App.—Beaumont 1988, no writ); *Goeke v. Houston Lighting & Power Co.*, 761 S.W.2d 835, 837 n. 1 (Tex.App.—Austin 1988), *rev'd on other grounds*, 797 S.W.2d 12 (Tex.1990); *Group Medical and Surgical Service, Inc. v. Leong*, 750 S.W.2d 791, 794–95 (Tex.App.—El Paso 1988, writ denied); *City of Fort Worth v. Groves*, 746 S.W.2d 907, 913 (Tex.App.—Fort Worth 1988, no writ); *Barron v. State*, 746 S.W.2d 528, 530 (Tex.App.—Austin 1988, no writ); *Reynolds v. Charbeneau*, 744 S.W.2d 365, 367 (Tex.App.—Beaumont 1988, writ denied); *Champion v. Wright*, 740 S.W.2d 848, 851 (Tex.App.—San Antonio 1987, writ denied); *Texas Low–Level Radioactive Waste Disposal Authority v. El Paso County*, 740 S.W.2d 7, 8 (Tex.App.—El Paso 1987, writ dism'd w.o.j.); *S.I. Property Owners' Ass'n v. Pabst Corp.*, 714 S.W.2d 358, 360 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.); *Gonzales v. City of Lancaster*, 675 S.W.2d 293, 294–95 (Tex.App.—Dallas 1984, no writ); *Mabe v. City of Galveston*, 687 S.W.2d 769, 771 (Tex.App.—Houston [1st Dist.] 1985, writ dism'd); *Develo-cepts, Inc. v. City of Galveston*, 668 S.W.2d 790, 793 (Tex.App.—Houston [14th Dist.] 1984, no writ); *Griffith v. Pecan Plantation Owners Ass'n, Inc.*, 667 S.W.2d 626, 628 (Tex.App.—Fort Worth 1984, no writ); *City of Houston v. Public Utility Comm'n of Texas*, 656 S.W.2d 107, 110 n. 1 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Public Utility Comm'n v. J.M. Huber Corp.*, 650 S.W.2d 951, 955–56 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Vaughn Bldg. Corp. v. Austin Co.*, 620 S.W.2d 678 (Tex.Civ.App.—Dallas 1981), *aff'd*, 643 S.W.2d 113 (Tex.1982); *War–Pak, Inc. v. Rice*, 604 S.W.2d 498 (Tex.Civ.App.—Waco 1980, writ ref'd n.r.e.).

consisted primarily of writings authored by one appellate judge.[45]

The majority has a simple way to deal with this venerable body of law—overrule only one case, making today's abrupt change in the law appear less drastic, while ignoring the rest. In fact, six Texas Supreme Court cases must be overruled and no less than twenty-five decisions of the courts of appeals must be disapproved to reach today's result. The concept of reliance on the prior decisions of Texas courts has long since ceased to offer the slightest restraint on this majority.[46]

Bulldozing a new path through this jurisprudential forest, the majority vaults standing to a new and remarkable prominence by suddenly discovering that it has not just *one* but *two* constitutional bases. And what unusual constitutional pillars each of these new finds represents. First, the proscription of the separation of powers doctrine against issuance of advisory judicial opinions allegedly requires rigorous enforcement of standing even when no party debates its existence. This link between standing and separation of powers is not predicated on any directly relevant prior court decision,[47] but instead is entirely premised on an article openly antagonistic to standing for environmental groups. 852 S.W.2d at 444, citing Atonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suf-folk U.L.Rev. 881 (1983). The current majority may be the first in the nation to anchor standing on this constitutional theory.

The authorities addressing the prohibition on advisory opinions cited in support of this proposition, of course, in no way implicate the question of standing. This precedent-setting concern with advisory opinions contrasts markedly with the eagerness to issue this very type of writing within the last year. *See Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491, 501 (Tex.1991) (Doggett, J., concurring); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 537 (Tex.1992) (Doggett, J., dissenting) (advisory opinions issued and retracted as necessary to thwart efforts to satisfy the constitutional command of equity and efficiency in our public schools). Writing on an issue not raised by any party, as the majority reaches out to revise the law of standing today, seems to me the very essence of an "advisory" opinion.

The second newly-announced constitutional basis is equally ironic—our state's vital guarantee that "[a]ll courts shall be open," Tex. Const. art. I, § 13, in some inexplicable way, mandates that they be closed to some and requires continual judicial monitoring of all who attempt to enter. No authority of any type is cited for this

---

**45.** *Texas Dep't of Mental Health v. Petty*, 778 S.W.2d 156, 166 (Tex.App.—1989, writ dism'd w.o.j.) (opinion by Powers, J.); *Public Utility Comm'n v. J.M. Huber Corp.*, 650 S.W.2d 951, 954–56 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (opinion by Powers, J.); *Hooks v. Texas Dep't of Water Resources*, 645 S.W.2d 874 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (opinion by Powers, J.); *see also Kircus v. London*, 660 S.W.2d 869, 872 n. 3 (Tex.App.—Austin 1983, no writ) (opinion by Phillips, C.J.).

**46.** *See, e.g., Boyles v. Kerr* (Tex.1992) (Doggett, J., dissenting) (objecting to majority's overruling of landmark Texas Supreme Court decision permitting recovery for negligence resulting in emotional distress); *Walker v. Packer*, 827 S.W.2d 833, 835 (Tex.1992, orig. proceeding) (Doggett, J., dissenting) (noting majority's "mass execution of precedent," encompassing "a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals"); *Carroll-*

*ton–Farmers Branch Indep. Sch. Dist.*, 826 S.W.2d at 539 (Tex.1992) (Doggett, J., dissenting) (discussing rejection by majority of its own decision issued less than one year previously); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 12 (Tex.1991) (Doggett, J., dissenting) (majority disregards its own recent precedent, looking instead to overruled case); *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 852 (Tex.1990) (Doggett, J., dissenting) (disapproving of rejection of recent controlling precedent).

**47.** The United States Supreme Court has clearly stated that standing does not implicate separation of powers concerns. *See Flast v. Cohen*, 392 U.S. 83, 100, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968) ("The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of ... Government.").

proposition that "open" courts really means "closed" courts. Nothing in the history or text of the provision justifies this reading nor has any Texas court previously attempted such converse interpretation. This constitutional guarantee is used today as a two-edged sword: the majority invokes the open courts provision to bar environmental groups from seeking judicial assistance in enforcing the laws, while in the very same opinion misinterpreting this provision to allow continued violation of statutes protecting our precious natural resources.[48]

Then, with a final flourish, standing is conveniently classified as a nonwaivable component of subject matter jurisdiction. Until today, Texas followed the rule, adopted by many of our sister states considering the issue, that objections to a party's standing are waived if not first raised in the trial court.[49] No Texas case is cited for the proposition that standing is part of nonwaivable subject matter jurisdiction because, until today, this court had repeatedly stated precisely the very opposite—that standing is *not* jurisdictional.[50]

Texas has with good reason determined that standing is not excepted from traditional rules of appellate procedure. Our appellate system is predicated on the requirement of presentation of complaints to the lower court coupled with preservation and briefing in the reviewing court. *See* Tex.R.App.P. 52; 74(d), 131(e). Appellate courts face considerable difficulties in deciding an issue not presented to the trial court; ordinarily, the necessary facts will not be fully developed. The unstated effect of today's opinion is to require trial courts to develop facts as to undisputed issues or risk subsequent appellate reversal. This is not an effective use of our limited judicial resources.

The requirement that issues first be presented to the trial court serves another function—preventing parties from "laying behind the log":

> The reason for the requirement that a litigant preserve a trial predicate for complaint on appeal is that one should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time.

*Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex.1982). While this court has condemned "trial by ambush," *Gutierrez v. Dallas Indep. School Dist.*, 729 S.W.2d

**48.** *See* section I, *supra.*

**49.** *See, e.g., Brown v. Robinson*, 354 So.2d 272, 273 (Ala.1977); *Jackson v. Nangle*, 677 P.2d 242, 250 n. 10 (Alaska 1984); *Torrez v. State Farm Mut. Auto Ins. Co.*, 130 Ariz. 223, 635 P.2d 511, 513 n. 2 (App.1981); *Cowart v. City of West Palm Beach*, 255 So.2d 673, 675 (Fla.1971); *Lyons v. King*, ·397 So.2d 964 (Fla.App.1981); *Greer v. Illinois Housing Development Auth.*, 122 Ill.2d 462, 120 Ill.Dec. 531, 552, 524 N.E.2d 561, 582 (1988); *Matter of Trust of Rothrock*, 452 N.W.2d 403, 405 (Iowa 1990); *Tabor v. Council for Burley Tobacco, Inc.*, 599 S.W.2d 466, 468 (Ky.App.1980); *Sanford v. Jackson Mall Shopping Ctr. Co.*, 516 So.2d 227, 230 (Miss.1987); *Fossella v. Dinkins*, 66 N.Y.2d 162, 495 N.Y.S.2d 352, 1019, 485 N.E.2d 1017, 1019 (1985); *Public Square Tower One v. Cuyahoga County Bd. of Revision*, 34 Ohio App.3d 49, 516 N.E.2d 1280, 1281 n. 2 (1986); *Federman v. Pozsonyi*, 365 Pa.Super. 324, 529 A.2d 530, 532 (1987); *McMullen v. Zoning Board of Harris Township*, 90 Pa.Cmwlth. 119, 494 A.2d 502 (1985); *International Depository, Inc. v. State*, 603 A.2d 1119, 1122 (R.I.1992); *State v. Miller*, 248 N.W.2d 377, 380 (S.D.1976); *Princess Anne Hills Civ. League, Inc. v. Susan Constant Real Estate Trust*, 243 Va.

53, 413 S.E.2d 599, 603 n. 1 (1992); *Tyler Pipe Industries, Inc. v. State Dep't of Revenue*, 105 Wash.2d 318, 715 P.2d 123, 128 (1986); *Poling v. Wisconsin Physicians Serv.*, 120 Wis.2d 603, 357 N.W.2d 293, 297–98 (App.1984). The majority's odd attempt to distinguish some of these cases, all of which are predicated in terms of standing, as involving solely the question of whether the litigant was a proper "real party in interest" has never been drawn previously in the published decisions of any Texas court addressing the question of standing. *See* cases cited at notes 44, *supra,* and 50, *infra.*

**50.** *See Texas Industrial Traffic League*, 633 S.W.2d at 822–23; *Central Educ. Agency v. Burke*, 711 S.W.2d at 8; *American General Fire & Casualty Co. v. Weinberg*, 639 S.W.2d 688; *Cox v. Johnson*, 638 S.W.2d at 868. To avoid overruling these, the majority claims all three recognized that lack of subject matter jurisdiction can initially be raised on appeal. True, but ignored is the conclusion of each that subject matter jurisdiction cannot be waived while standing can be.

691, 693 (Tex.1987), today the majority promotes "ambush on appeal."

Three purported policy justifications for the majority's actions are offered, with not a single supporting authority. The first concern is that a strict standing rule is necessary to prevent collusive litigation. Under Texas law, the filing of a fictitious suit constitutes contempt by counsel, Tex. R.Civ.P. 13, and may serve as the basis for a host of sanctions, including dismissal with prejudice. Tex.R.Civ.P. 215 2b(5). Nor does our Texas judiciary lack the ability to reject collusive litigation. *Felderhoff v. Felderhoff,* 473 S.W.2d 928, 932 (Tex. 1971) ("We believe that our laws and judicial system are adequate to ferret out and prevent collusion...."); *cf. Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985) (refusing to uphold Texas Guest Statute because of danger of collusion). Adhering to precedent today would in no way undermine the power to dismiss fraudulent suits.

The second virtue proclaimed for today's holding is the guarantee that the lower courts will be restrained from exceeding their jurisdictional powers. 852 S.W.2d at 445. This concern is derived solely from the federal law mandate that a federal appellate court is duty-bound to verify not only its own jurisdiction but that of the lower courts as well. Federal courts, however, have limited jurisdiction; Texas courts do not. Our Texas Constitution creates courts of general jurisdiction, investing them with all of the "judicial power of this State." Tex. Const. art. V, § 1. The differences are evident in our procedural rules. While a federal court must affirmatively ascertain jurisdiction over parties appearing before it, a Texas court's jurisdiction is presumed until proven lacking by a contesting party. *See* Tex.R.Civ.P. 120a.

Lastly, the majority expresses concern as to the res judicata effect on other potential litigants of a judgment rendered in the absence of genuine standing. 852 S.W.2d at 445–446. Aware of this concern, the very federal judiciary that this majority is so eager to emulate has failed to perceive it as a problem of significance. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). If representation is inadequate, or a conflict of interest between members exists, any judgment will have minimal preclusive effect. *Id.* Instead of completely barring access to the courts, procedural safeguards can ameliorate any potentially overbroad effects. *See generally* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, 18 Federal Practice & Procedure § 4456 at 490–94 (1981 & Supp.1991).

The manufactured nature of the majority's concerns becomes all the more evident when the real world experience of Texas is considered. The majority is unable to point to a single example of collusion during the three decades our Texas rule, which allows the issue of standing to be waived, has been in place. During this period there have likewise been no examples of lower courts making a grab for extrajurisdictional power, nor of oppressed litigants shackled by the res judicata effect of contrived litigation.

In defining state requirements for standing, we are in no way bound by federal jurisprudence founded upon converse jurisdictional principles from our own. Texas courts can afford their citizens access to justice in circumstances where they would have been unable to establish standing in the federal courts. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 113, 103 S.Ct. 1660, 1671, 75 L.Ed.2d 675 (1983) ("state courts need not impose the same standing ... requirements that govern federal-court proceedings"); *Doremus v. Board of Education,* 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952) (state courts not restrained by "case or controversy" limitations of Federal Constitution); *Greer v. Illinois Housing Development Auth.,* 122 Ill.2d 462, 120 Ill.Dec. 531, 524 N.E.2d 561 (1988) ("We are not, of course, required to follow the Federal law on issues of justiciability and standing.").

The differences between our Texas Constitution and the Federal Constitution not only justify, but also require, that citizen groups be accorded a broader right of ac-

cess to our state courts. The Texas Constitution contains no express limitation of courts' jurisdiction to "cases" or "controversies," as provided by the federal charter. U.S. Const. art. III, § 2. Instead, it affirmatively protects the rights of litigants to gain access to our judicial system:

All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

Tex. Const. art. 1, § 13. As this court has recognized,

The provision's wording and history demonstrate the importance of the right of access to the courts.... The right of access to the courts has been at the foundation of the American democratic experiment.

*LeCroy v. Hanlon*, 713 S.W.2d 335, 339 (Tex.1986).

This constitutional mandate is reflected in decisions of this court adopting an "open courts" approach to standing in general and associational standing in particular. On several occasions, we have recognized the power of the Legislature to exempt litigants from proof of "special injury." *Scott v. Board of Adjustment*, 405 S.W.2d 55, 56 (Tex.1966) (standing may be shown even in the absence of particular damage); *Spence v. Fenchler*, 107 Tex. 443, 180 S.W. 597 (1915) (under statute, "any citizen" able to seek injunction, without showing particular interest or personal damage).[51] In enacting the Uniform Declaratory Judgments Act, the Texas Legislature has granted a broad right of standing: any person "whose rights, status or other legal relations *are affected by* a statute" may seek a declaration of those rights. Tex. Civ.Prac. & Rem.Code § 37.004 (emphasis supplied).

This court has previously extended its "open courts" approach to groups representing the interests of their members.[52] In *Texas Highway Comm'n v. Texas Ass'n of Steel Importers*, 372 S.W.2d 525, 530–31 (Tex.1963), we permitted a business association to challenge an administrative order. Although the order addressed only the import of foreign products for highway construction, this court recognized standing of an organization whose interest in foreign imports was not so limited:

Some of [the respondents] are owners of imported foreign manufactured products suitable for highway construction purposes. All of them are actively engaged in the sale and use of imported manufactured products.... [S]uch parties clearly have the right and litigable interest to have the challenged ... Order declared null and void.

*Id.* at 531. Similarly, in *Touchy v. Houston Legal Foundation*, 432 S.W.2d 690 (Tex.1968), the court considered whether an organization of attorneys had standing to maintain a suit against a charitable corporation to restrain violations of ethical canons governing the practice of law. Based solely on "the special interest attorneys have in their profession," the court held standing was established.

The "open courts" approach [53] of *Touchy* and *Texas Highway Commission* is quite sufficient to allow TAB access to the Texas

---

51. Our past acknowledgement of the legislative power to expand access to Texas courts is inconsistent with today's conclusion that we must narrowly limit access. *See* Mark V. Tushnet, *The New Law of Standing: A Plea for Abandonment*, 62 Corn.L.Rev. 663 (1977) (because court decisions do not question legislative power to confer standing by statute, they suggest that standing rules are not constitutionally grounded).

52. Despite the participation of associational litigants before this court, we have never before questioned standing on our own motion. *See, e.g., Austin Indep. Sch. Dist. v. Sierra Club*, 495 S.W.2d 878 (Tex.1973).

53. *See Safe Water Foundation of Texas v. City of Houston*, 661 S.W.2d 190, 193 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.) (recognizing precedent of this court as according broad right of standing), *app. dism'd*, 469 U.S. 801, 105 S.Ct. 55, 83 L.Ed.2d 6 (1984); *Texas Industrial Traffic League v. Railroad Comm'n of Texas*, 628 S.W.2d 187 (Tex.App.—Austin) (discussing Supreme Court's expansive approach to standing to allow access to Texas courts), *rev'd*, 633 S.W.2d 821 (Tex.1982) (per curiam), *overruled by Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440 (Tex.1993).

courts.[54] These two associational standing cases are all but ignored today, brushed aside as setting forth "no particular test." 852 S.W.2d at 446.

Yet in these cases in which the merits of standing are preserved for appellate court review, the Texas test applied has not been complicated. We simply look to whether a party has a stake in the action sufficient to ensure adversarial presentation of the issues and to whether the court's judgment will have any effect on those before it. *See Board of Water Engineers v. City of San Antonio*, 155 Tex. 111, 283 S.W.2d 722, 724 (1955) ("there shall be a real controversy between the parties, which ... will be actually determined by the judicial declaration sought."). Because both of these considerations are met in the instant case, reference to federal law is wholly unnecessary.

Today, however, to justify meddling with Texas standing law, the majority declares that "we foresee difficulties" not here with TAB, but in future cases involving organizational standing. 852 S.W.2d at 446. To cure these perceived but as yet totally unrealized woes, the majority imposes a difficult to meet, easy to manipulate standard drawn from federal law "that lends itself to our use." *Id.* at 447. Never needing an invitation to impose more federal requirements on Texas citizens, the majority writes into our Texas law books the confused and troubling federal standing limitations. Not surprisingly, that law has taken a regressive turn, denying standing to public interest associations, including those seeking to protect the environment. *See* Gene R. Nichol, Jr., *Abusing Standing: A Comment on Allen v. Wright*, 133 U.Pa. L.Rev. 635, 659 (1985) ("One could perhaps be forgiven for confusing standing's agenda with that of the New Right.").

The benefits of permitting an association to represent the concerns of its members are manifest. As recognized in *United Auto Workers*, 477 U.S. at 290, 106 S.Ct. at 2533, "[T]he primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." Judicial economy is promoted when one litigant can, in a single lawsuit, adequately represent many members with similar interests, thus avoiding repetitive and costly actions. The wider range of resources often available for associations enhances their effectiveness in litigation:

> Special features, advantageous both to the individuals represented and to the judicial system as a whole, ... distinguish suits by associations on behalf of their members.... An association suing can draw upon a pre-existing reservoir of expertise and capital. "Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack." ... These resources assist both courts and plaintiffs.

*Id.* at 289–90, 106 S.Ct. at 2532–33. In some cases, an injury that is substantial as to many may have an individual financial impact too small to make a challenge economically feasible. Associational representation may be the only means of redressing conduct when the harm is limited in degree but substantial segments of society are affected. Additionally, in challenging policies of government, organizations are generally less susceptible than individuals to retaliation by the bureaucrats they challenge.

These benefits are ignored as the majority declares that henceforth the right of associations to bring suit in Texas courts will be constricted by a three-part federal test set forth in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), requiring that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's

---

**54.** *Accord Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex.1984) (recognizing statutorily-granted standing of litigants to seek mandamus to reduce substantial delays in court operations); *Safe Water Foundation of Texas v. City of Hous-ton*, 661 S.W.2d 190 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.), *app. dism'd*, 469 U.S. 801, 105 S.Ct. 55, 83 L.Ed.2d 6 (1984) (drinking water consumer group had standing to contest fluoridation of city water).

purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." [55]

Yet the *Hunt* test won't hunt in Texas. It is adopted purportedly because of the similarities between the state and federal constitutional underpinnings of the standing doctrine. Two critical factors are ignored: (1) the significant differences between the Texas and United States Constitutions and (2) the fact that much of federal standing doctrine is not mandated by the federal charter, but is imposed solely on the grounds of judicial "prudence." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("This [standing] inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.").

The majority works a grave disservice to our Texas Constitution by equating our open courts provision, affirmatively guaranteeing all Texans access to our judicial system, with an express federal constitutional limitation on the right to seek redress in court. Despite the fact that the two provisions are vastly different in language, history and purpose, the majority nonetheless determines to "look to the more extensive jurisprudential experience of the federal courts" to determine standing. This is clearly an erroneous course. *See Davenport v. Garcia,* 834 S.W.2d 4 (Tex.1992, orig. proceeding) (in blindly adhering to federal law, "based on different language, different history and different cases, "[f]rom our treasured state heritage, law and institutions ... [we] derive nothing....").

Even the federal constitutional constraint is a simple one, looking to whether "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of the court's remedial powers on his behalf." *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205, *quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 1103, 7 L.Ed.2d 663 (1962). In fact, this bare-bones test closely resembles the approach that Texas courts have long chosen to follow. To the extent *Hunt* constructs additional barriers to access to our judicial system, they are wholly court-created.[56] No justification for their adoption is contained in the majority opinion.

Moreover, in turning to the federal law of standing, the majority invokes a doctrine that has been criticized more heavily and justifiably than perhaps any other. *See, e.g.,* Gene R. Nichol, Jr., *Rethinking Standing,* 72 Cal.L.Rev. 68, 68 (1984); Mark V. Tushnet, *The "Case or Controversy" Controversy,* 93 Harv.L.Rev. 1698, 1713–21 (1980). Even the United States Supreme Court has recognized that federal standing requirements have an "iceberg quality," *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968); yet the majority fails to navigate a course, not unlike the captain of the Titanic, that would steer Texas well away from this potential disaster.

The concept of standing is "employed to refuse to decide the merits of a legal claim." Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531, at 338. Critics of the doctrine's complexity and uncertainty have recognized how subject it is to manipulation: "standing ... is no more than a convenient tool to avoid uncomfortable issues or to disguise a surreptitious ruling on the merits." *Id.* at 348 (citing commentaries).[57] Important rights can be left unpro-

---

**55.** These requirements are allegedly necessary to protect "the members' best interest." 852 S.W.2d at 447. Perhaps an organization's members are in a better position than this court to determine what is in their best interest.

**56.** Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure, § 3531.3, at 418 ("The problems [of standing] are difficult enough without the compounding effect of constitutional attribution.").

**57.** *See also, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 490, 102 S.Ct. 752, 768, 70 L.Ed.2d 700 (1982) (Brennan, J., dissenting); Abram Chayes, *The Supreme Court, 1981 Term—Foreword: Public Law Litigation and the Burger Court,* 96 Harv.L.Rev. 4, 23 (1982) (Having ritually recited the standing formula, "the Court then chooses up sides and decides the case."); Michael A. Wolff, *Standing to Sue: Capricious Application of Direct Injury Standard,*

tected as a result. *Id.* at § 3531.3, 416–17 ("Standing decisions present courts with an opportunity to avoid the vindication of unpopular rights, or even worse to disguise a decision on the merits in ... opaque standing terminology.... Unarticulated and arbitrary predilection, cast as standing, defeats rights that deserve judicial protection.").

Even during the three years that this particular cause has been pending here, the federal courts have been hard at work to manipulate standing requirements to bar public interest groups from seeking judicial vindication of rights common to their members. In *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), a nationally-recognized environmental group challenged a new development classification for certain federal wilderness areas that allegedly violated several federal statutes. The suit was dismissed for lack of standing based upon a rigid construction of the requirement of injury to the association's members. This decision has been widely criticized as significantly impairing the ability of public interest groups to represent their members, particularly those that seek to protect this nation's environment and natural resources.[58] Today the majority eagerly positions itself to give the same treatment to those Texans who would petition our state courts to protect the public interest. The majority not only conspicuously relies on *Lujan,* 852 S.W.2d at 445, but also embraces the extremist anti-environmental stance propounded in an article openly criti-

cal of judicial opinions permitting citizens to complain of harm inflicted upon our natural resources. *Id.* at 443–444, citing Atonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U.L.Rev. 881 (1983).

Rather than a careful consideration of our Texas precedent and our unique Texas Constitution, today Texans are handed yet another unthinking embrace of federal law. Claiming "guidance" from federal precedent, 852 S.W.2d at 445, the majority overrules all Texas cases treating standing as a procedural issue, then unnecessarily modifies all Texas precedent addressing the merits of standing. Without explanation, today's opinion simply photocopies into our Texas law books the federal law of standing with all of its much-criticized complexities. Once again the majority chooses more Washington wisdom for Texas when what we need is more Texas thinking in Washington. *See Bexar County Sheriff's Civ. Service Comm'n v. Davis,* 802 S.W.2d 659, 665 (Tex.1990) (Doggett, J., dissenting).

While today the corporate members of the Texas Association of Business are permitted to challenge the bureaucracy, tomorrow this same reasoning will be employed to bar public interest, neighborhood, environmental and consumer groups from vindicating the rights of their members. Today's opinion not only repudiates our past "open courts" approach to access to the judicial system but also eliminates the long-recognized appellate requirement that

20 St.L.U.L.J. 663, 678 (standing barrier "raised or lowered based on the degree of hostility to, or favoritism for, consideration of the issues on their merits"); Albert Broderick, *The* Warth *Optional Standing Doctrine: Return to Judicial Supremacy?* 25 Cath.U.L.Rev. 467, 504, 516–17 (1976).

**58.** *See* Katherine B. Steuer and Robin L. Juni, *Court Access for Environmental Plaintiffs: Standing Doctrine in* Lujan v. National Wildlife Federation, 15 Harv.Envtl.L.Rev. 187, 232–33 (1991); Sarah A. Robichaud, Note, Lujan v. National Wildlife Federation: *The Supreme Court Tightens the Reins on Standing for Environmental Groups,* 40 Cath.U.L.Rev. 443, 470–74 (1991); V. Maria Cristiano, Note, *In Determining an Environmental Organization's Standing to Chal-*

*lenge Government Actions Under the Land Withdrawal Review Program, the Use of Lands in the Vicinity of Lands Adversely Affected by the Order of the Bureau of Land Management Does Not Constitute Direct Injury*—Lujan v. National Wildlife Federation, 2 Seton Hall Const. L.J. 445 (1991); Michael J. Shinn, Note, *Misusing Procedural Devices to Dismiss an Environmental Lawsuit,* 66 Wash.L.Rev. 893, 904–12 (1991); Lynn Robinson O'Donnell, Note, *New Restrictions in Environmental Litigation: Standing and Final Agency Action After* Lujan v. National Wildlife Federation, 2 Vill.Envtl.L.J. 227, 251 (1991); Bill J. Hays, Comment, *Standing and Environmental Law: Judicial Policy and the Impact of* Lujan v. National Wildlife Federation, 39 Kan. L.Rev. 997, 1042–43 (1991).

error be preserved. The majority has charged well beyond traditional constraints in its writing.

To the extent this case is about standing, it is about standing still, about closing the courthouse door, once standing open. For today the majority extends a standing invitation to those who would harm our environment to act without fear of citizen challenge in the Texas courts.

## IV. Conclusion

Today the environment is the immediate victim. Those who pollute our rivers, release toxins into our air, and damage our land cannot be promptly penalized. Instead, only after the very slow wheels of our judicial system have creaked to a stop will violators of environmental protection laws be held accountable.

Yet the environment is not the whole story. Much as a river may seem pure and clear even at the place where illegal sewage is being pumped into it, the danger from a court's opinion may not be immediately apparent on its surface. Only after the reasoning is applied in other cases is the severity of the resulting harm to our system of justice revealed. Today's impairment of the ability of concerned citizens to vindicate the rights of many in our courts and the majority's knockout punch to the right of trial by jury will unfold in future cases to bar participation of ordinary citizens in Texas courts.

The mess in Texas is not only with our environment but with the misinterpretation of the law.

GAMMAGE, Justice, concurring and dissenting.

Though I would prefer not to write separately, I find I am unable to agree entirely with any single opinion of the court's other members. I must write this concurring and dissenting opinion because, while I agree with the disposition of this cause, I disagree with substantial portions of the reasoning and language in the majority's opinion and I agree with part of Justice Doggett's concurring and dissenting opinion.

I agree with the preliminary portion of Justice Cornyn's majority opinion, which correctly sets forth the regulatory scheme and basic dispute.

I agree *substantially* with Part II of Justice Doggett's opinion and his jury trial discussion. In my view, whether or not a suit is a "cause" for purposes of the right to a jury trial is not controlled by whether it was first determined by an administrative agency. I also agree with Part III of Justice Doggett's opinion relating to standing, which I will further address below. I agree with Part II of Justice Cornyn's majority opinion. The statutes may not condition access to the courts on prepayment of a *penalty*. The principle here is the same as for a supersedeas bond. The statute may condition the right to restrain the prevailing party (the State) from executing (enforcing) its judgment (administrative order) on the posting of a bond for the full amount. It may not, however, condition the *right to appeal* the judgment on posting of the full *penalty* imposed. *Dillingham v. Putnam*, 109 Tex. 1, 5–6, 14 S.W. 303, 304 (1890). This is true even if that "judgment" takes the form of an administrative agency decision. Administrative agency decisions, for the most part, entitle an appellant to only "substantial evidence" as opposed to *de novo* review. To further burden those regulated with prepayment of the "judgment" as the only alternative to total loss of even substantial evidence review violates the basic concept of our constitutional open courts in Texas.

As to the issue (or non-issue) of standing, the majority in effect adopts the position of federal courts that standing is a *jurisdictional* question. Otherwise it cannot be fundamental error to be addressed when no party raises it. Standing was not raised and should not be addressed in this cause.

Even assuming standing is an element of subject matter jurisdiction, the court should not write on the issue in this case. Even though a judgment is void and subject to collateral attack at any point if there is an absence of subject matter jurisdiction, *see Mercer v. Phillips Natural Gas Co.,*

746 S.W.2d 933, 936 (Tex.App.—Austin 1988, writ denied), unassigned error of lack of jurisdiction should be addressed only if jurisdiction is in fact lacking. Since the majority concludes there was standing in this case, and since no party raised its existence as an issue, there is no reason to address it at all, even if it would be *fundamental error* if *lacking*.

The basis for the majority's discussion is its sudden revelation that "[s]tanding is implicit in the concept of subject matter jurisdiction." 852 S.W.2d at 443. Their opinion then claims this implication comes from the separation of powers doctrine and the open courts provision of the Texas Constitution. It is a curiosity of legal scholarship, however, that in the 156 prior years of its existence, this court never before found standing "implicit" in those constitutional provisions, but in fact wrote that standing could be waived and hence was not fundamental error. *Texas Indus. Traffic League v. Railroad Comm'n*, 633 S.W.2d 821, 823 (Tex.1982). Justice Doggett's opinion adequately addresses why there is no implication from those provisions that standing is jurisdictional.

The majority's struggle to put standing in issue when it is not prompts me to address two statements in its opinion which strike me as either misleading or just plain wrong. The majority asserts, without citation to authority, that "[s]ubject matter jurisdiction is never presumed," 852 S.W.2d at 443–444, and in a footnote repeats that assertion in urging that "Justice Doggett confuses subject matter jurisdiction with personal jurisdiction. Only the latter can be waived when uncontested. *See* Tex. R.Civ.P. 120a." 852 S.W.2d at 444 n. 5. The majority's claim that subject matter

jurisdiction is never presumed is at its very best misleading.

Connected with this discussion is the implicit assertion in another footnote that there is a "jurisdictional standing" that is different from "objections to join a real party in interest or to a party's capacity to sue rather than jurisdictional standing." 852 S.W.2d at 445 n. 7. These remarks are made in an attempt to distinguish the cases cited by Justice Doggett from those of other states holding that standing is not jurisdictional. I suppose we should be encouraged to find out that there are some types of "standing" that will not be jurisdictional, but it occurs to me that by using the term "jurisdictional standing" the court is begging the question—if it is jurisdictional, then it must be fundamental. The problem is that the Texas cases, at least as I read them, define "standing" in terms of "the party's capacity to sue,"[1] which is one example we are given of non-jurisdictional standing. The majority opinion is calculated—no, guaranteed—to cause confusion because apparently this court will henceforth tell litigants on a case-by-case basis whether the standing problems in their cases are "jurisdictional" or merely formal.

There is no need to create this confusion. The majority's fomenting it, however, requires that I address it to some extent. I will discuss the "subject matter never presumed" proposition first, then weave into the "jurisdictional standing" language.

I agree that subject matter jurisdiction is never presumed in one respect. Subject matter jurisdiction exists when the nature of the case falls within a general category of cases the court is empowered to adjudicate under the applicable constitutional and statutory provisions. *See Pope v. Fergu-*

---

1. Before it adopts a federal test and federal gloss, the majority asserts the "general test for standing in Texas" is what it quotes from *Board of Water Engineers v. City of San Antonio*, 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955). The majority overrules the *Texas Industrial Traffic League* case, which addressed standing in the context of "justiciable interest" discussed in the more recent cases of *Coffee v. William Marsh Rice University*, 403 S.W.2d 340 (Tex.1966), and *Sabine River Authority v. Willis*, 369 S.W.2d 348 (Tex.1963). The context of the cases differed

from *Board of Water Engineers*, of course. The precise meaning of "standing" in fact depends on the context. The majority adopts a federal gloss, and the federal courts have stated, "Generalizations about standing to sue are largely worthless as such." *Association of Data Proc. Serv. Orgs. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Using "standing" to mean a party's legal capacity to sue is my best description of the labyrinth of different cases the majority uses interchangeably.

son, 445 S.W.2d 950, 952 (Tex.1969), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970); *Bullock v. Briggs,* 623 S.W.2d 508, 511 (Tex.App.—Austin 1981, writ ref'd n.r.e.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982). In this sense, there is no presumption because if the case is not one over which the court had constitutional and statutory authority to act one does not "presume" subject matter jurisdiction to make it valid. If a justice of the peace grants a divorce, the judgment is void because that is not the type of case the constitution and legislature entrusts to that court, and appellate courts will not "presume" the justice court had jurisdiction in order to make the judgment valid.

But what the majority addresses here under the rubric of "standing" is not a court assuming jurisdiction over a type of dispute for which the statutes do not grant it power. The district court undoubtedly had jurisdiction over the declaratory judgment and injunction action brought there, since district courts may entertain declaratory judgment and injunction actions. The question of standing the majority gratuitously addresses here is related to an incidental *party* issue.

This court has expressly held that some facts or similar matters relating to party issues *are presumed.* For example, for many years the subject matter jurisdiction for certain trial courts as set by the statutes has included a jurisdictional amount, sometimes as a minimum amount in controversy and sometimes as both a maximum and minimum. *Womble v. Atkins,* 160 Tex. 363, 370, 331 S.W.2d 294, 299 (1960). This court has held that jurisdiction, so far as the amount in controversy is concerned, is determined by the pleadings unless facts disclose that a party fraudulently or in bad faith pleaded claims to make it appear there was jurisdiction over the case where

there was not. *Brown v. Peters,* 127 Tex. 300, 94 S.W.2d 129, 130 (Tex.Comm'n App. B 1936). Despite the supposed requirement that the pleadings demonstrate jurisdiction, we have also held that unless the pleadings affirmatively show there is *no* jurisdiction, the court will *presume* the existence of jurisdiction in the trial court. *Peek v. Equipment Serv. Co.,* 779 S.W.2d 802, 804 (Tex.1989).[2] This is not the only sense in which subject matter jurisdiction is "presumed" as to collateral matters. If a defendant contests jurisdiction and alleges in a verified pleading that plaintiff's fraudulent pleading amount was for the purpose of conferring jurisdiction on the trial court, but the trial judge still renders judgment in the case, on appeal the fact issue of jurisdiction is *presumed* decided against the defendant. *Ellis v. Heidrick,* 154 S.W.2d 293, 294 (Tex.Civ.App.—San Antonio 1941, writ ref'd); *see also Maddux v. Booth,* 108 S.W.2d 329, 331 (Tex.Civ.App.—Amarillo 1937, no writ) (appeal bond from county court to district court did not show filemark making the appeal timely, held "the absence of such a question being made in the trial court the presumption is that the court had jurisdiction"). Further, if the very power of the judge who sits is in question, that authority too may be presumed. It is presumed that the assignment of a retired judge was properly made pursuant to all statutory requirements absent an express showing to the contrary in the record. *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 855 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

There is a type of lack of standing that this court formerly held to be fundamental error. When there was a joint interest in property involved in the litigation, and the joint owner was not joined as a party, this court earlier held that the party defect was jurisdictional fundamental error that could be raised for the first time on appeal. The injustice which that rule caused prompted

---

**2.** *Richardson v. First Nat'l Life Ins. Co.,* 419 S.W.2d 836 (Tex.1967), relied upon by the majority for the proposition that pleadings must "affirmatively show that the court has jurisdiction to hear the cause," 852 S.W.2d at 446, was expressly distinguished in *Peek.* This unanimous opinion written for the Court by Chief

Justice Phillips explained that *Richardson* really meant that if the pleadings affirmatively showed there was *no* jurisdiction, then the case should be dismissed, but otherwise there was a presumption that the amount omitted from the pleading would support jurisdiction. *Peek,* 779 S.W.2d at 804.

this court to reduce those *"indispensable"* necessary parties to near nonexistence. *Petroleum Anchor Equip., Inc. v. Tyra,* 406 S.W.2d 891, 893–94 (Tex.1966); *see also Cooper v. Texas Gulf Indus., Inc.,* 513 S.W.2d 200, 203 (Tex.1974). It was no accident that this court listed the case which the majority today overrules, *Texas Indus. Traffic League v. Railroad Comm'n,* 633 S.W.2d 821 (Tex.1982), as one of the cases showing that "[f]undamental or unassigned error is a discredited doctrine" as applied to these collateral defect-in-party type claims. *Cox v. Johnson,* 638 S.W.2d 867, 868 (Tex.1982). After more than a hundred years of trying to narrow fundamental error exceptions, the majority today takes a quantum leap *backward.*

In an appeal of or other *direct attack* on a trial court default judgment, it is service on the defendant and related due process requirements which must affirmatively appear on the record. In such cases *personal* jurisdiction cannot be presumed. *Capitol Brick, Inc. v. Fleming Mfg. Co.,* 722 S.W.2d 399, 401 (Tex.1986); *Uvalde Country Club v. Martin Linen Supply Co.,* 690 S.W.2d 884, 885 (Tex.1985); *McKanna v. Edgar,* 388 S.W.2d 927, 928 (Tex.1965). Lack of personal jurisdiction can be waived by the party, and personal jurisdiction is presumed *in a collateral attack* on the judgment, whereas error in assuming constitutional or statutory jurisdiction not conferred upon the court in question can be neither waived nor ignored. *See Crawford v. McDonald,* 88 Tex. 626, 631–32, 33 S.W. 325, 328 (1895). This court has long recognized that there may be party issues, i.e., the matter is "a mere matter of procedure" as opposed to the constitutional or statutory *power* of a court to render judgment, that may be presumed as to either type of jurisdiction. *Id.* at 630, 33 S.W. at 327.

The majority should not adopt the federal courts' position that "standing" is jurisdictional. There is a fundamental difference between federal law and state law that controls here. Federal courts are courts of *limited* jurisdiction. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 178–79, 2 L.Ed. 60 (1803). The parties asserting a claim must plead and prove (when not obvi-

ous) that jurisdiction exists. Fed.R.Civ.P. 8(a). A party suing under a statute must establish his right to claim under that statute—his *standing*—in order to establish jurisdiction. *General Comm., Brotherhood of Locomotive Eng'rs v. Missouri–Kansas–Texas Ry. Co.,* 320 U.S. 323, 337–38, 64 S.Ct. 146, 152–53, 88 L.Ed. 76 (1943). Consequently, standing is a part of jurisdiction under federal procedure, related to the "case" or "controversy" requirement of the federal constitution. *Association of Data Proc. Serv. Orgs. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). But there is no "case" or "controversy" limitation language in the Texas Constitution. In state courts of general jurisdiction, the power to entertain any suit not prohibited by either the federal constitution or federal law is *presumed.* *Cincinnati v. Louisville & N. Ry. Co.,* 223 U.S. 390, 32 S.Ct. 267, 56 L.Ed. 481 (1912). State courts have all residual jurisdiction that federal courts lack. *Id.; see generally* 2 CHESTER J. ANTIEAU, MODERN CONSTITUTIONAL LAW § 10:1 at 4–5 (1969). We should continue to recognize that "standing," like other procedural issues, may be waived. There is no reason to overrule the *Texas Industrial Traffic League* case, or its related progeny.

SPECTOR, Justice, concurring and dissenting.

I agree with the substance of the concurring and dissenting opinion by Justice Doggett. I write separately, however, to explain why I would uphold the statutory requirement that those who run afoul of environmental laws make timely payment of administrative penalties before seeking judicial review.

In two other causes decided today, this court has considered open courts challenges to the statutory requirement that state mineral lessees prepay administrative deficiency assessments before seeking judicial review of those assessments. *State v. Flag–Redfern Oil Co.* and *State v. Rutherford Oil Corp.,* 852 S.W.2d 480 (Tex.1993) (considering Tex.Nat.Res.Code § 52.137). Our analysis in those cases focused on the

public interest at stake: the State's only interest in the prepayment requirement, we noted, was its financial interest in immediate access to disputed royalty payments. *Id.* at 485. Thus, we concluded that the prepayment requirement of section 52.137 was no different, in constitutional terms, from the litigation tax disapproved in *LeCroy v. Hanlon*, 713 S.W.2d 335, 342 (Tex. 1986). *Id.*

The present case, in contrast, does not involve a litigation tax. The Clean Air Act, the Solid Waste Disposal Act, and the Water Quality Act embody this state's commitment to protect the environment; and the prepayment requirements struck down today were intended to give force to that commitment, *not* to raise revenue. Without the need to prepay administrative penalties, polluters will be left with little if any incentive to timely comply with environmental laws and regulations.

The effects of today's decision, though, extend far beyond the statutes at issue in this case. By rejecting these prepayment requirements, without regard to the state interest involved, the majority has struck a severe blow to this state's ability to enforce a broad range of regulations in the public interest. The similar statutory provisions identified in the opinion by Justice Doggett, 852 S.W.2d at 457, cannot be dismissed as minor technicalities; they are carefully-crafted measures that the legislature considered vital to protect the public from recalcitrant lawbreakers. Casting those provisions aside will seriously disrupt the effective operation of our state government.

The Texas Constitution cannot be construed in absolutes. The basic right of access to the courts must be balanced against the need to protect the public's health and safety. While the restriction at issue in this case may be substantial, I would hold that the public's interest in clean air and water, combined with the due process afforded to TAB's members in the administrative process, tips the balance in favor of the prepayment requirement. I therefore dissent.